**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| RADLAX GATEWAY HOTEL, LLC, et al., | ) | Case No. 09-30047 |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | Hon. Bruce W. Black |
| | ) | |
| | ) | |

**LENDER'S OBJECTION TO DEBTORS' MOTION FOR AN ORDER:**
**(A) APPROVING PROCEDURES FOR THE SALE OF SUBSTANTIALLY ALL**
**OF THE DEBTORS' ASSETS; (B) SCHEDULING AN AUCTION;**
**(C) APPROVING ASSUMPTION AND ASSIGNMENT PROCEDURES;**
**(D) APPROVING FORM OF NOTICE; AND (E) GRANTING RELATED RELIEF**

Amalgamated Bank, as Trustee of Longview Ultra Construction Loan Investment Fund, f/k/a Longview Ultra I Construction Loan Investment Fund, in its capacity as administrative agent for itself and San Diego National Bank, now part of U.S. Bank, National Association (collectively, the "Lender"), by and through its undersigned attorneys, hereby submits the following objection (the "Objection")[1] to the Motion of RadLAX Gateway Hotel, LLC ("Gateway Hotel") and RadLAX Gateway Deck, LLC ("Gateway Deck" and, together with Gateway Hotel, the "Debtors") for an Order:  (A) Approving Procedures for the Sale of Substantially All of the Debtors' Assets; (B) Scheduling an Auction; (C) Approving Assumption and Assignment Procedures; (D) Approving Form of Notice; and (E) Granting Related Relief (the "Motion").[2]  In

---

[1]  The length of this brief essentially matches that of the Motion.  The Lender asks the Court to accept it even though it exceeds the usually-applicable page limits.  The Lender notes that its length is partially a function of the necessity of the Lender's having to discuss some plan and confirmation law and procedure issues that the Motion unavoidably raises.  The Motion is not a simple, stand-alone bidding procedures motion.

[2]  Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

support of this Objection, the Lender states as follows:

## I. PRELIMINARY STATEMENT

1.      Under the guise of the Motion, the Debtors seek this Court's advance, *sub rosa* seal of approval of their fatally flawed Plan without going through the plan solicitation and confirmation process Congress prescribed to protect the interests of creditors.   This transgression of bankruptcy law and procedure is especially troubling because, although the Debtors pay lip service to the business judgment rule (which itself is not even a confirmation standard), the proposed Bid Procedures serve the interests of only two parties:   the Stalking Horse and the Debtors' insiders, all at the expense of the Lender, the Debtors' estates, and other creditors.   The Debtors' manipulative effort to fast track the confirmation of a Plan that cannot be confirmed must be halted and their Motion should be denied.   For these reasons, too, the Debtors' plan exclusivity should be terminated to allow for a fair, open, and competitive process aimed at maximizing the value of these estates.[3]   The Lender hopes to propose a competing plan that will be more favorable to all key creditor constituencies than any plan the Debtor is able to propose, let alone what the Debtor has currently offered.

2.      To advance the interests of the insiders and the favored Stalking Horse, the Debtors ask this Court to conduct what amounts to a bifurcated confirmation hearing and, in the context of the Motion, sanction a below-market sale of the Lender's collateral by finding that the Plan satisfies the "fair and equitable" test under the "indubitable

---

[3] The Lender intends in the near future to file a motion asking the Court to find that exclusivity already has terminated or, in the alternative, to terminate exclusivity.  It will also oppose any proposed extension of exclusivity.

equivalent" prong of section 1129(b)(2)(A)(iii) of the Bankruptcy Code. By a mere superficial citation to *In re Philadelphia Newspapers, LLC*, 599 F.3d 298 (3d Cir. 2010) ("*Philadelphia Newspapers*") and *In re The Pacific Lumber Co.*, 584 F.3d 299 (5th Cir. 2009) ("*Pacific Lumber*"), the Debtors would have this Court deny the Lender the right to credit bid, depriving it of its property interests and the valuable rights afforded it under the Bankruptcy Code without any defensible justification or counterbalancing compensation.

3.      No doubt emboldened by the Third Circuit's ruling, the Debtors advance a sale under questionable circumstances, where insiders feature prominently, for a price at a fraction of the Lender's secured claims. The Lender respectfully submits that the holdings in both *Philadelphia Newspapers* and *Pacific Lumber* reflect a narrow view of the statute at odds with the Bankruptcy Code's comprehensive treatment of secured creditors and Congressional intent. This Court is not bound by either decision.

4.      Even if this Court were to follow the principles of *Philadelphia Newspapers* and hold that the Lender is not entitled to credit bid as a matter of right, there is no justifiable basis here for precluding credit bidding.

5.      There appears to be only one uncontroverted factor in support of the Debtors' effort to exclude credit bidding — it is a condition imposed by the Stalking Horse to entrench its position and those of its insider allies. The Debtors have not offered any valid reason why excluding credit bidding serves the interests of their estates or creditors; clearly it is inimical to the Lender's interests without serving the interests of other creditors, either.

6.      The Debtors obviously recognize that this Court may decline to follow *Philadelphia Newspapers*.  Not surprisingly then, the Debtors seek to disenfranchise the Lender under the "for cause" standard of section 363(k) of the Bankruptcy Code.   In support, the Debtors resort to mere allegations of misconduct on the part of the Lender. As a matter of law, mere allegations do not suffice, and "cause" does not otherwise exist within the purview of section 363(k) to deny the Lender the opportunity to credit bid.

7.      Irrespective of whether this Court elects to deny the Lender the right to credit bid, the Bid Procedures should not be approved.  The Debtors seek to pre-ordain confirmation through their proposed Bid Procedures as part of their scheme to stack the outcome of the auction in favor of their insiders and the Stalking Horse.  However, they have not even filed a disclosure statement, let alone initiated a true confirmation process that affords creditors the protections Congress prescribed.  The Debtors' conduct is both substantively and procedurally improper.  The Motion implicates critical confirmation issues that can only be considered in connection with proper confirmation procedures. Moreover, because the Debtors' insiders figure prominently in the Stalking Horse transaction, the proposed stalking horse sale is subject to strict scrutiny, a burden the Debtors cannot meet.  In this regard, the Lender has reason to believe that the marketing process was not fair and open, but rather manipulated to guarantee a continuing role for insiders.  This latter issue alone warrants a full factual investigation and assessment because it vitally affects such key confirmation issues as whether the Debtors filed the Plan in good faith, whether the Plan is in the best interests of creditors, and whether the preclusion of credit bidding will afford the Lender the "indubitable equivalent" even if the Court subscribes to *Philadelphia Newspapers*.

8.    Moreover, the Bid Procedures apparently seek to satisfy significant estate obligations – such as FBR's fee, the Break-Up Fee, the Expense Reimbursement and executory contract cure claims – from the proceeds of the Lender's collateral.   In practical effect, the Debtors seek to surcharge the Lender's collateral under section 506(c) of the Bankruptcy Code without satisfying the test imposed by the statute.  The Lender is at a loss to see how a potentially vastly under-market stalking horse sale either advances or protects their interests in their collateral.

9.    Finally, it is intuitively unlikely that selling the Hotel deep from the trough of a severely depressed market is the most tenable way to achieve a favorable chapter 11 outcome.   Sale of the Hotel in the present market – let alone as the product of the Debtors' insider-biased marketing process – cannot achieve the primary purposes of chapter 11, namely, (i) reorganizing the Debtors' business and debt structure, and (ii) maximizing the distributions to their creditors.   *See, e.g., Fl. Dept. of Rev. v. Piccadilly Cafeterias, Inc.*, 128 S. Ct. 2326, 2329 (2008), citing *Toibb v. Radloff*, 501 U.S. 157, 163 (1991) ("Chapter 11 strikes a balance between a debtor's interest in reorganizing and restructuring its debts and the creditors' interest in maximizing the value of the bankruptcy estate").  Here, the Debtors forego any attempt at reorganization, and instead would force a sale on the Lender that will not benefit it or any of the Debtors' other creditors, and is not designed to do so.[4]

---

[4] This is one of the reasons to dispense with exclusivity:  the Lender may propose a plan that better protects its interests while also offering a better result for unsecured creditors and other key constituencies.

## II. BACKGROUND/FACTS

10.     The Debtors are the owners and operators of the Radisson Hotel and related assets located near Los Angeles International Airport.  The related assets include a parking deck on which there is a stalled and incomplete expansion project.  (Motion at ¶¶ 5, 11.)  As the Debtors' monthly reports reflect, only the hotel assets produce income.

11.     On August 17, 2009 (the "Petition Date"), the Debtors and certain affiliated entities filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. sections 101 et seq. (the "Bankruptcy Code").  The cases are jointly administered.

12.     The Debtors' Schedules A of real property schedules the value of the properties as "unknown".  (Dkt. Nos. 58, 61.)  The Debtors have never amended these Schedules or elsewhere filed any document that places a value on the properties.

13.     The Lender holds essentially a blanket lien on all of the Debtors' assets, including the Real Property that is the subject of the Motion and the proceeds thereof.  The cash the Debtors generate is the Lender's cash collateral within the meaning of Bankruptcy Code section 363(a).  During the pendency of the chapter 11 cases, the Lender has consented to the use of its cash collateral for the day-to-day operations of the Debtors' business.

14.     As of the commencement of the cases, the Lender's claims totaled at least $130,000,000, with interest accruing at about $1.5 million a month.  (See Claim Nos.13-1 and 99, filed February 14, 2010.)

15.    As the Debtors' monthly Summary of Cash Receipts and Disbursements in the cases reflect, the Debtors have not made any payments to the Lender, including interest, amortization, or any other item.

16.    There are also various mechanics' lien claims against the Real Property.  It is disputed whether these claims, if otherwise valid, are junior or senior to the Lender's claims.

17.    The proposed sale to the Stalking Horse is the foundation of the Plan filed contemporaneously with the Motion.  In violation of Bankruptcy Rule 3016, a disclosure statement was not filed with the Plan.  Pursuant to the unexecuted and undated Stalking Horse Agreement filed with the Court on June 22, 2010 – two weeks *after* the Debtors filed the Motion and the Plan – the Debtors propose to sell substantially all of their assets to the Stalking Horse for $47.5 million, free and clear of liens.  The purchase price represents approximately 37% of the value of the Lender's pre-petition claims.  Through the proceeds of sale and cash on hand, all of which is encumbered by the Lender's liens, under the Plan the Debtors propose to fund, among other obligations, their administrative and priority claims, a class of miscellaneous secured claims, and secured tax claims. Under an opaque Plan formula, both holders of general unsecured claims and the Lender on account of its unsecured deficiency claim are entitled to a limited share of the surplus, if any, over and above a 12% return to the Stalking Horse generated by the Stalking Horse's operation of the Hotel for three years following the Plan Effective Date.  General Unsecured Creditors receive 15% of this imaginary amount and the Lender receives 5%. This pipe dream of a profit sharing component is net of both an Asset Management Fee

and Management Fee, among other fees.  Presumably, the Debtors' insiders will share in the Asset Management and Management Fee.[5]

18.     On its face, the Stalking Horse Agreement is illusory.  Remarkably, while the Debtors request approval of the Bid Procedures, which include a detailed process for the selection of "Qualified Bidders," and the scheduling of an auction, the Stalking Horse Agreement allows the Stalking Horse an unqualified due diligence out, which it can exercise, in its sole discretion and without penalty, within 30 days of the Court's approval of the Bid Procedures Motion.[6]   (Motion, at ¶ 15; Stalking Horse Agreement, section 4.1(a).)  No doubt each Qualified Bidder will seek an identical out, thus rendering the auction process illusory as well.

19.     Similarly the Stalking Horse Agreement provides the Stalking Horse with several other "outs" by imposing artificial drop dead-dates for which the Debtors offer no justification other than that they are terms imposed by the Stalking Horse.  For example, the Bid Procedures Motion must be approved by a final order by August 31, 2010, and the yet-to-be-filed disclosure statement must be approved by a final order by October 11, 2010.  (Stalking Horse Agreement, section 4.4.)  The failure to meet any of these deadlines entitles the Stalking Horse to terminate the Stalking Horse Agreement.  *Id.*

20.     According to the Motion, the Debtors began evaluating restructuring alternatives in November of 2009 through the efforts of their financial advisor, FBR. (Motion at ¶¶ 12-13.)  It is not clear from the Motion whether FBR advised the market

---

[5] Inexplicably, the profit sharing component is not memorialized by the terms of the Stalking Horse Agreement.

[6] It is a puzzle why the Stalking Horse needs yet more time for due diligence after becoming the stalking horse bidder pursuant to what the Debtors repeatedly have touted as lengthy and robust marketing process by their specialist, FBR, a subject the Lender discusses further below.

that the Hotel, the Parking Land, and the other Real Property assets were potentially up for sale, or at what point, if any, an asset sale became FBR's focus. The Debtors contend that 30 parties entered into confidentiality agreements with the Debtors; however, no details are furnished about the parties, including their identities or the subject of their interest, other than vague statements concerning telephone calls and in-person meetings. (Motion at ¶¶ 12-13.) Although it is unclear how the Real Estate was marketed, ultimately, the Debtors elected to enter into the Stalking Horse Agreement with a limited liability company.[7] True to form, scant information is furnished about the Stalking Horse other than its connections to the Debtors. According to the Debtors, the Harp Group and Blue Vista will hold a 5% interest in the Stalking Horse. The Harp Group's sole shareholder and principal is Peter G. Dumon, an insider of the Debtors. (Mr. Dumon is, incidentally, in his own voluntary chapter 7 case in this District (Case No. 10-20211). No information is provided about Blue Vista. In addition, the Hotel's existing management company, Portfolio LAX, LLC, will continue to manage the Hotel if the Stalking Horse purchases the Real Property. That company is, in turn, affiliated with Portfolio Hotels & Resorts, LLC, which, in turn, is affiliated (unsurprisingly) with the Harp Group.

21.     The Lender is justifiably concerned that the marketing of the Hotel and related properties was done with a view to guaranteeing a continuing role for the Debtors' insiders. As a result, interested parties and potential bidders who had no interest in partnering with the insiders – that is, who predictably want to choose their own team to acquire and manage such an expensive investment – may have, from the outset, been

---

[7] The Motion states that it is "expected" that Och-Ziff Real Estate Acquisitions LP or its designee will hold a 95% interest in the Stalking Horse.

discouraged from any interest in an acquisition or investment. If true, this conduct amounts to a serious breach of fiduciary duty, and calls into question both the process leading up to, and the terms of, the Stalking Horse transaction. In the event the Court does not deny the Motion as a matter of law, for the reasons that the Lender will discuss presently, substantial discovery will be required.[8] For example, the Lender will seek discovery from the Debtors (including management and other insiders), FBR, the Stalking Horse and its principals, and third-parties who may have expressed an interest in the Debtors and their assets.

22.    It simply is premature and procedurally improper to turn this contested matter into a *de facto* partial confirmation hearing. The Lender expressly reserves all objections and rights with respect to the Plan and the yet-to-be-filed disclosure statement. However, by making the Motion and seeking to preclude credit bidding under the purported Plan sale, the Debtors have inexorably linked the Bid Procedures and the Stalking Horse Agreement to the Debtors' ultimate ability to confirm the Plan. It is, therefore, appropriate for the Lender to raise some facial confirmation issues now.

23.    As discussed below, because the Plan seeks an impermissible cramdown, it cannot be confirmed. Given the Debtors' approach, the Lender is constrained to highlight, in summary fashion, the Plan's other several defects. The following is just a sample of the serious deficiencies with the Plan:

- The Debtors have not filed a disclosure statement, yet they request that this Court decide the Motion even though it seeks approval of a core element of the Plan. The Lender, the Court, and all stakeholders should have a full and fair opportunity

---

[8] In the meantime, as the Lender will explain below, *all* discovery should be abated until and unless the Court and parties know that the Motion has survived the Lender's objections to it as a matter of law and know what the remaining issues are for which discovery will be needed.

to review an approved disclosure statement in connection with the evaluation of the instant Motion. *See* 11 U.S.C. § 1125.

- Given the insiders' connection to the Stalking Horse, the Plan may not have been proposed in good faith. *See* 11 U.S.C. § 1129(a)(3).

- The Debtors cannot provide the Lender with the indubitable equivalent of its collateral because credit bidding is denied without alternative compensation, and the proposed sale price is not the fair market value of the Real Property. *See* 11 U.S.C. § 1129(b)(2)(A)(iii).

- By purporting to satisfy claims subordinate to the Lender's secured claims, the Plan violates the absolute priority rule and impermissibly imposes a surcharge on the Lender's collateral without compliance with section 506(c) of the Bankruptcy Code. *See* 11 U.S.C. §§ 506(c), 507.

- The Plan, which proposes the liquidation of the Debtors, attempts to improperly classify the Lender's deficiency claim and imposes discriminatory treatment on the class. *See* 11 U.S.C. §§ 506, 1122, 1129(a)(1) and 1129(b)(1).

- Given the absence of pertinent information, it is entirely uncertain whether the Plan is feasible. *See* 11 U.S.C. § 1129(a)(11).

## III.  ARGUMENT

### A.    The Bid Procedures Motion Must be Denied in Its Entirety.

24.    Given the unfair and inequitable treatment of the Lender's claims the Debtors seek to impose under the Plan, it comes as no surprise that the Debtors recognize that their only hope of confirming the Plan and locking up the sale to the favored Stalking Horse is through the cramdown provisions of section 1129(b)(2)(A)[9] of the Bankruptcy Code.

---

[9] Section 1129(b)(2)(A) provides:

(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

(A) With respect to a class of secured claims, the plan provides—

(i) (I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and (II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim,

25.    Although numerous courts have reached a different conclusion,[10] in *Philadelphia Newspapers*, the Court held that, notwithstanding the express provisions of section 1129(b)(2)(A)(ii) of the Bankruptcy Code, the secured creditors did not have a statutory right to credit bid their claims in the context of a plan providing for the sale of their collateral free and clear of their liens because the debtor had the potential to cramdown the plan under the "indubitable equivalent" prong of 1129(b)(2)(A)(iii). *Philadelphia Newspapers*, 599 F.3d at 313. *See also Pacific Lumber*, 584 F.3d at 245-46 (stating that secured creditors must show that section 1129(b)(2)(A)(ii) is exclusively applicable to a proposed sale in order to be entitled to credit bid).

26.    The decision goes to great lengths to address both the appellant's arguments and Circuit Judge Ambro's emphatic and well-reasoned dissent. However, the holding is premised on a formulaic and rigid approach to statutory construction that relies primarily on the fact that the three prongs of section 1129(b)(2)(A), under which a secured creditor may be subject to cramdown, are phrased in the disjunctive. *Philadelphia Newspapers*, 599 F.3d at 304-10. In so doing, the decision overrides critical secured creditor and estate protection designed expressly to guard against the

---

(continued)

of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

(ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or

(iii) for the realization by such holders of the indubitable equivalent of such claims.

[10] *See, e.g., In re California Hancock*, 88 B.R. 226, 230 (9th Cir. BAP 1988) (requiring credit bidding where confirmation was sought under subsection (i)); *In re River Village*, 181 B.R. 795, 805 (E.D.Pa.1995) (permitting credit bidding in a § 363(b) pre-confirmation sale, but confirming the reorganization under subsection (i)); *In re 222 Liberty Assocs.*, 108 B.R. 971, 980 (Bankr. E.D. Pa. 1990) (stating that the purpose of § 1111(b)(1)(A) is not satisfied by a sale at which the lienholder may not credit bid); *In re Kent Terminal Corp.*, 166 B.R. 555, 565-66 (Bankr. S.D.N.Y. 1994) (same, and agreeing with holding of *California Hancock*).

undervaluation of secured creditor collateral and Congressional intent, and undervaluation that, worse yet, benefits no one but the selected bidder.

27.    Here, the Debtors' self-serving and collusive effort to avoid a real market test of the value of the collateral through an open and fair auction where credit bidding is allowed is a perfect illustration of the type of conduct Judge Ambro in his dissenting opinion concluded would flow from the majority's holding.  Judge Ambro cautioned that the majority's ruling would promote the undervaluation of assets, and allow the stalking horse to acquire the assets on the cheap.  "If the debtors here prevail, a direct consequence is that debtors generally would pursue confirmation under [1129(b)(2)(A)(ii)] only if they somehow concluded that providing a right to credit bid as required by that clause would be more advantageous to them than denying that right. This is illogical when one considers that credit bidding is a form of protection for the secured creditor, not the debtor."  *Philadelphia Newspapers*, 599 F.3d at 336, J. Ambro, *dissenting*.  Judge Ambro specifically identifies the inequitable results of the majority's decision on the facts before the court.  "Instead of allowing the lenders their presumptive right to credit bid, debtors wish to confirm a plan that sells the collateral without the procedural safeguard against undervaluation contemplated by the Code's drafters . . . The only party that stands to benefit from any undervaluation is the purchaser of the assets, ostensibly the Stalking Horse with substantial insider and equity ties."  *Id.*

28.    It is easy to see why Judge Ambro's analysis is correct.  All cash will go to the secured creditors until their total claim is paid.  If the stalking horse bidder's bid is below market but the secured creditor cannot raise cash to overbid, then the stalking horse bidder will get the asset at below market value without producing a penny for

creditors junior to the secured creditor.  *Only the stalking horse bidder benefits by that outcome*.  It is hard to conceive that bankruptcy law is designed to confer such a windfall on a stalking horse bidder without producing any benefit for the parties with whom bankruptcy is most concerned:  the creditors.  It is even harder to see the point when, as here, the Stalking Horse includes insiders who are getting a deal, even though from a bankruptcy perspective they are out of the money.

29.    The similarities between the perverse results Judge Ambro feared would flow from the majority's decision in *Philadelphia Newspapers* and the Debtors' and the Stalking Horse's strategy here is striking.  Through their alliance, the Debtors and the Stalking Horse seek to leverage *Philadelphia Newspapers* to game the system.  Without citation to authority, or empirical evidence, the Debtors' principal argument against credit bidding is that it would chill the bidding process.  The Lender refutes this allegation.  Likewise, there can be no cognizable argument that precluding credit bidding favors the Debtors' unsecured creditors.  As just explained, the below market bid would not benefit them as junior claimants.  Moreover, in this instance, their recovery under the Plan – their gossamer prospects of a share of profits over a 12% return to the Stalking Horse – is not dependent on the purchase price or the size of the Lender's deficiency claims.  Indeed, the Debtors proffer only one piece of evidence in support of their position that credit bidding should be precluded — it would violate the Stalking Horse Agreement.  Thus, rather then attempting to maximize value for the Lender and the other secured creditors, or their estates, in this case, it is the Stalking Horse and its Debtor allies who seek to depress value to assure the Stalking Horse's bid prevails.

30.     This Court is not bound by the decisions in *Philadelphia Newspapers* or

*Pacific Lumber. See, e.g., Lucoski v. IRS*, 126 B.R. 332, 337 (S.D. Ind. 1991) (noting that

a decision rendered by a federal circuit court in another circuit is persuasive, but not

binding authority).   The Seventh Circuit has not addressed the issue.   The Lender

respectfully submits that the better reasoned application of the relevant provisions of the

Bankruptcy Code would preclude confirmation under the "indubitable equivalent" prong

of section 1129(b)(2)(A) of the Bankruptcy Code in the context of a plan sale free and

clear of liens.

> **1.     Under Application of Canons of Statutory Construction
> Section 1129(b)(2)(A)(ii) is the Exclusive Means to Cramdown
> Secured Creditors Under a Free and Clear Plan Sale.**

31.     A plain reading of section 1129(b)(2)(A) of the Bankruptcy Code reflects

the ambiguity in the statute.   Though section 1129(b)(2)(A)(i)-(iii) is phrased in the

disjunctive, section 1129(b)(2)(A)(ii) specifically addresses plan sales and requires that

sales free and clear of liens be subject to credit bidding as prescribed by section 363(k) of

the Bankruptcy Code.   *See* 11 U.S.C. § 1129(b)(2)(A)(ii).   The specificity of section

1129(b)(2)(A)(ii) suggests a much more practical and purposeful interpretation of section

1129(b)(2)(A) then the one postulated by the courts in *Philadelphia Newspapers* and

*Pacific Lumber* and advocated by the Debtors.   "Congress did not list the three alternative

routes to cramdown confirmation that were universally applicable to any plan, but instead

as distinct routes that apply to specific requirements."   *Philadelphia Newspapers*, 599

F.3d at 325.  Judge Ambro's observations on this point are particularly instructive:

> To use clause (iii) to accomplish a sale free of liens, but
> without following the specific procedures prescribed by
> clause (ii), undoubtedly places the two clauses in conflict.
> It seems Pickwickian to believe that Congress would

> expend the ink and energy detailing procedures in clause
> (ii) that specifically deal with plan sales of property free of
> liens, only to leave general language in clause (iii) that
> could sidestep entirely those very procedures. Unlike the
> majority, I do not read the language to signal such a result;
> I read the text to show congressional intent to limit clause
> (iii) to those situations not already addressed in prior,
> specifically worded clauses.

*Philadelphia Newspapers*, 599 F.3d at 329, J. Ambro, *dissenting.*  *See also In re California Hancock*, 88 B.R. 230-31 (9th Cir. BAP 1988) (noting that legislative history indicates an intention to allow credit bidding when property is being sold pursuant to a reorganization plan); *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 237 n.50 (3d Cir. 2004) (noting that the general provisions of Bankruptcy Code § 105 cannot be used to achieve a result not contemplated by more specific provisions of the Bankruptcy Code).

32.    As the situation before this Court illustrates, it is hard to envision how adopting the position urged by the Debtors does not render the second clause of 1129(b)(2)(A) superfluous, except in the rare instance when a debtor advocates credit bidding.[11] *Philadelphia Newspapers*, 599 F.3d at 330-31, J. Ambro, *dissenting.*

33.    The dissent in *Philadelphia Newspapers* is correct in arguing that the three prongs of section 1129(b)(2)(A) are distinct channels for providing a secured lender with fair and equitable treatment of its lien.  First, subclause (i) defines fair and equitable treatment of secured claims under circumstances where the secured claimant will retain its liens and receive future cash payments on account of its secured claim.  Next, subclause (ii) provides for the sale of the property that is "subject to the liens securing such claims, free and clear of such liens," with such sale to expressly be subject to credit

---

[11] One can imagine that a debtor whose insiders are also the secured lenders might prefer credit bidding, again to benefit insiders.

bidding by the creditor under section 363(k).  Finally, subclause (iii) provides the alternative of providing the creditor with "the indubitable equivalent" of its secured claims.  This third prong acts only as "a 'catch-all' not designed to supplant subclauses (i) and (ii) where they plainly apply." *Philadelphia Newspapers*, 599 F.3d at 326.  As Judge Ambro further argues in his dissent, "if plan sales free of liens were permitted outside of clause (ii), the secured creditor would not only lose the undervaluation protection afforded in non-plan-sale situations [*i.e.*, by the protections afforded secured creditor to make the election set forth in section 1111(b)(2)], but it would also lose the only undervaluation protection Congress provided and considered in the sale-free-of-liens scenario." *Id.* at 334.  Thus, Judge Ambro concludes that "Congress intended to channel all plan sales free of liens through § 1129(b)(2)(A)(ii)." *Id.*  To conclude otherwise would render the credit bidding protections afforded under subclause (ii) superfluous.

> **2.     The Bankruptcy Code Protects Against the Undervaluation of Secured Creditors' Interests in Collateral.**

34.     The position advocated by the Debtors deprives the Lender of the rights granted to it as a secured creditor under the Bankruptcy Code.  Specifically, section 363(k) of the Bankruptcy Code permits a secured lender to credit bid the full amount of its claim where the debtor proposes to sell collateral free and clear of the secured creditor's liens.  The right to credit bid under section 363(k) serves as a check against the undervaluation of collateral.  *See, e.g.*, 7 Collier on Bankruptcy, ¶ 1111.03[4] (16th ed. 2010).  *See also Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.)*, 432 F.3d 448, 461 (3d Cir. 2006) (the right to credit bid preserves the secured creditor's status by ensuring that its debt is either paid in full or that the collateral remains in place to secure the debt).

35.    Among the other secured creditor protections contained in the Bankruptcy Code, is the secured creditor's right to make an election under section 1111(b) of the Bankruptcy Code.   11 U.S.C. § 1111(b).   The section 1111(b) election right applies to both recourse and non-recourse creditors.   Under section 1111(b)(2), secured creditors have the right to treat their claims as fully secured, notwithstanding the value of the collateral, and to forego any deficiency claim.   Section 1111(b)(2) provides in relevant part, that "if such election is made, then notwithstanding section 506(a) of this title, such claim is a secured claim to the extent that such claim is allowed."   *See* 11 U.S.C. § 1111(b)(2).   The practical implications of making the 1111(b)(2) election is to allow an undersecured creditor to realize any future appreciation in the value of its collateral following the debtor's emergence from bankruptcy.   *See, e.g.*, 7 Collier on Bankruptcy, ¶ 1111.03[4] (16th ed. 2010).   If a secured creditor makes an election under section 1111(b)(2), the debtor may retain the creditor's collateral only by paying the creditor the full amount of its claim.   *Id.*   Thus, by design and in practice, the section 1111(b)(2) election acts as a check against undervaluation and preserves the secured creditor's state law rights and the benefit of its bargain. *See Matter of 183 Lorraine St. Assocs.*, 198 B.R. 16, 27 (Bankr. E.D.N.Y. 1996) ("The purpose of the section 1111(b)(2) election is to protect secured creditors from depreciations in the market value of property securing claims.").

36.    However, the section 1111(b)(2) election is not available to secured creditors with recourse if the "property is sold under section 363 of this title or is to be sold under the plan"   11 U.S.C. § 1111(b)(1)(B)(ii).   Even then, all is not lost for the secured creditor because it has the right to credit bid under section 363(k) in both sales

under section 363 and under any plan, subject only to denial for cause. The Congressional record explains the reason for the exclusion of the section 1111(b)(2) election in the context of assets sales: a "sale of property under section 363 or under a plan is excluded from treatment under section 1111(b) because of the secured party's right to bid in the full amount of its allowed claim at any sale of collateral under section 363(k) of the House Amendment." 124 Cong. Rec. 32,407 (1978) (statement of Rep. Edwards), *reprinted in Collier on Bankruptcy*, App. Pt. 4(f)(i)(2). *See also In re Kent Terminal Corp.*, 166 B.R. 555, 565-66 (Bankr. S.D.N.Y. 1994) ("Arguably, Congress intended an absolute right to credit bid in all liquidating plans when it formulated the relationship among §§ 363(k), 1111(b), and 1129(b)."); 7 Collier on Bankruptcy, ¶ 1111.03[3][b] (16th ed. 2010).

37.    Thus, section 1111(b) and section 363(k) work in tandem to protect the secured creditor against the kind of undervaluation with which the Motion and Plan are pregnant.    Notwithstanding these critical provisions, the Debtors advocate an interpretation at odds with the Bankruptcy Code's well constructed mechanism of secured creditor protection in order to advance the interests of the Stalking Horse and their insiders.

### 3.    There Is No "Cause" to Deny Credit Bidding.

38.    If this Court adopts the view that the Plan may only be crammed down on the Lender under the second prong of 1129(b)(2)(A), then the Motion must be denied as there is no "cause" to deny Lender the right to credit bid under section 363(k) of the Bankruptcy Code as a matter of law.  As a consequence, the Plan cannot be confirmed.

39.     The Debtors conjure up a hodgepodge of reasons to deny credit bidding for cause, none of which suffices.  The cases cited are inapposite to the facts at bar.  A survey of cases addressing the denial of a right to credit bid "for cause" under section 363(k) reveals that the issue has arisen in the context of disputes regarding the priority of competing secured creditors, where a preference or fraudulent conveyance action was pending against the secured creditors, or where no cash proceeds would be available to distribute to equal priority creditors.  *See, e.g., In re NJ Affordable Homes Corp.*, 2006 Bankr. LEXIS 4498,*58-61 (Bankr. D.N.J. June 29, 2006); *In re Octagon Roofing*, 123 B.R. 583 (Bankr. N.D. Ill. 1991); *In re St. Croix Hotel Corp.*, 44 B.R. 277 (D.V.I. 1984); *In re Diebart Bancroft*, 1993 U.S. Dist. LEXIS 836 (E.D. La. Jan. 25, 1993).   Such circumstances are inapplicable here.

40.     Moreover, rather than deny the right of the secured creditor to credit bid, courts deciding these cases have instead placed certain conditions upon the credit bid where they thought some additional terms were necessary.  Typically, these conditions, if imposed at all, consist at most of requiring the creditor to post a bond or letter of credit. *See, e.g., In re Diebart Bancroft*, No. #92-3744 C/W 92-3745, 1993 U.S. Dist. LEXIS 836 at *15 (E.D. La. Jan. 25, 1993) (requiring a credit bidder to pay cash into an escrow account in the amount of a possibly senior secured claim and, consistent with the requirements applied to other bidders in the auction, put up a 10% cash deposit); *In re St. Croix Hotel Corp.*, 44 B.R. 277, 278 (D.V.I. 1984) (permitting a secured lender to offset the purchase price against the amount of its claim "on an intermediate basis, to become permanent, or to be negated as the case may be, upon the final determination of whether [the lender was] entitled to an 'allowed claim'").

41.     Without any empirical basis, the Debtors resort to the self-serving mantra that credit bidding chills bidding.   Were this argument meritorious, under what circumstances should credit bidding *ever* be permitted?   In fact, one must ponder why Congress would then prescribe credit bidding as the norm under section 363(k), even if it contemplated excluding credit bidding under section 1129(b)(2)(A)(iii).

42.     Lastly, the Debtors advance the novel theory that the unsubstantiated "bad acts" alleged to have been perpetrated by Amalgamated Bank and U.S. Bank call for the denial of credit bidding on equitable grounds.   The Debtors cite no authority denying credit bidding under such circumstances.   Nor, of course, have they provided any evidence of such alleged bad acts.   The Lender, of course, denies the Debtors' allegations.

43.     The case posing facts that are most closely analogous to those alleged by the Debtors is *In re Octagon Roofing*, 123 B.R. 583 (Bankr. N.D. Ill. 1991).   But even there the court did not proscribe credit bidding.   In that case, the trustee attempted to sell a secured lender's collateral over the lender's objection through an auction process while denying the lender the ability to credit bid.   The trustee alleged a dispute as to the validity of a certain mortgage and guaranty executed in favor of the lender, which was the subject of a pending adversary proceeding between the parties.   The court noted in its findings of fact that (i) the debtor was unable to find an alternative to finance its obligations to the lender prior to the bankruptcy filing, and (ii) the lender would have effectively shut down the operations of the debtor if it had not executed the mortgage and guaranty. *Id.* at 596. *The court nonetheless allowed the lender to credit bid.*   To protect the trustee's asserted interest in the proceeds of the collateral should the trustee prevail in the adversary proceeding, the court ordered that the lender deliver an irrevocable letter of credit to the

trustee to secure that portion of the lender's credit bid that was derived from the disputed collateral. The court also conditioned the right of the lender to credit bid on the possibility that the lender might be required to pay more cash should the trustee prevail in his suit, and the lender's right to credit bid was shown to have been diminished. *Id.* at 589.

44.     The Debtors' allegations of misconduct here are no more egregious than those present in *Octagon*; even if the degree of *alleged* misconduct were a factor, here, almost a year after the Debtors filed their cases, there is no adversary proceeding (or contested matter) pending directly attacking the validity of the Lender's secured claims (indeed, the Debtors have only just raised the claims in the Motion).

45.     Even if the Debtors' allegations are true (which, as discussed below, can only be determined following discovery and an extensive evidentiary hearing in what would amount to a full-blown claim objection proceeding), the Court should reject the Debtors' attempt to prevent the Lender from credit bidding. The denial of a right to credit bid is an equitable remedy. As such, it should be applied so as to be remedial rather than penal. Put differently, it should be applied only to the extent necessary to offset specific harm that other creditors have suffered on account of the inequitable conduct. In this instance, in order to justify denying the Lender the ability to credit bid, the alleged bad acts would have to translate into damages substantial enough to eliminate the cushion between the Stalking Horse purchase price and the amount of the Lender's secured claim, an amount greater than approximately $82.5 million in damages, assuming a purchase price of $47.5 million. If the damages are anything less, then denying the Lender the right to credit bid does not provide any benefit to other creditors or to the Debtors'

estates, contrary to fundamental equitable principles and one of the underlying purposes

of the Bankruptcy Code, which is to protect creditors and the estate. The Debtors have

not, and the Lender submits cannot, prove any damages, much less damages of this

magnitude, as a result of the Lender's alleged "bad acts." Thus, the Debtors fail to

establish sufficient grounds that would merit the unprecedented remedy of precluding

altogether the Lender's ability to credit bid.

46.     Moreover, the Debtors' suggestion that "cause" to forbid credit bidding

pursuant to section 363(k) of the Bankruptcy Code may be grounded on the fact that the

FDIC has entered into a loss sharing agreement with U.S. Bank National Association in

connection with its acquisition of San Diego National Bank makes no sense whatsoever.

First, the Debtors have provided absolutely no authority for the insupportable proposition

that a secured lender should not be allowed to credit bid because it has received a partial

guaranty of its loan. Second, as a matter of public policy, it is indefensible to suggest that

the FDIC should be forced to subsidize the Debtors at the expense of financial institutions

that are required by statute to pay assessments to assure the stability of the banking

system of the United States.

**B.     In the Alternative, Extensive Discovery and an Evidentiary Hearing
Are Required if There is a Potential Basis to Deny the Lender's Right
to Credit Bid for Cause.**

47.     The Lender respectfully submits that for the reasons it has discussed, this

Court should deny the Debtors' request to prevent the Lender from credit bidding as a

matter of law, without an evidentiary record. Nonetheless, in light of the Debtors'

allegations of misconduct, if this Court does not deny as a matter of law the Debtors'

request to deny credit bidding for cause, an evidentiary hearing will be necessary. That

means that substantial discovery, including third-party discovery, will be necessary, as well as a complex trial on the merits.  The Debtors raise serious allegations of misconduct on the part of the Lender that implicate, in part, the substantial claims filed by the Lender in these cases.  This will necessitate exhaustive discovery, briefing, and trial schedule, and will likely consume several months at a minimum.  Moreover, it may be appropriate to consider at such a hearing the issue of whether the marketing process the Debtor has employed cannot produce the indubitable equivalent, rather than postponing that issue for the formal confirmation hearing that a ruling by the Court in the Lender's favor would obviate.  Whether the Court precludes credit bidding on the basis of "cause" or in accordance with *Philadelphia Newspapers*, the Debtors would still have to show that their Bid Procedures and plan will produce the "indubitable equivalent."  *See, e.g.*, 3 Collier on Bankruptcy ¶ 361.03 (15th ed.) (discussing the indubitable equivalent standard in the context of adequate protection and stating, "In those situations in which the collateral is to be consumed in the business . . . compensation to the creditor or replacement of the expended collateral, may be required."); *In re Sandy Ridge Dev. Corp.*, 881 F.2d 1346, 1350 (5th Cir. 1989) (stating that in order to receive an indubitable equivalent, a secured creditor must receive a "substitute" for the value of its claim); *In re Atlanta Southern Bus. Park, Ltd.*, 173 B.R. 444 (Bankr. N.D. Ga. 1994) ("[T]he 'indubitable equivalent' standard . . . considers whether the treatment a creditor receives under the plan is completely compensatory.") (citations omitted).  Discovery now on that issue would then be needed, too.  In the meantime, until and unless the Court rejects the Lender's arguments that they should be able to credit bid as a matter of law, the parties should not engage in what may be costly but needless discovery.

**C.     Even if the Court Precludes Credit Bidding, the Motion Should be Denied.**

48.     The Debtors' ill conceived and self-serving effort should be stopped. Through the vehicle of the Motion, the Debtors attempt to bifurcate the Plan confirmation process and force this Court to rule on Plan confirmation issues in a vacuum, without the benefit of the plan confirmation process, including an approved disclosure statement. The Debtors concede that the Motion is an element of plan confirmation, as the Bid Procedures themselves provide that the "Plan Sale is being conducted under sections 1123(a) and (b) and 1129(b)(2)(iii) of the Bankruptcy Code . . . ." (Motion, at p. 15; Bid Procedures, section (h).)  Even were this Court to preclude credit bidding, given the questions surrounding the Debtors' marketing effort and the selection of the Stalking Horse's bid, whether the Debtors can cramdown the Plan under the indubitable equivalent standard is at best uncertain.  Yet, the Debtors would have this Court approve the Bid Procedures, and sanction the auction process in the face of enormous uncertainty on this crucial issue even though a ruling in the Lender's favor might obviate further confirmation proceedings altogether.

49.     Moreover, plan exclusivity should terminate, if it has not already done so, to allow for a fair and open process.[12]  If however, the Court permits the Debtors to proceed with an asset sale, the Debtors should be directed to file a disclosure statement immediately and proceed with the confirmation process, at which all issues relevant to confirmation, including those under 1129(b) can be heard and decided, with any auction

---

[12] The Lender believes that exclusivity terminated on June 9, 2010, per the Court's Order Extending the Debtors' Exclusive Periods Within Which to File a Plan of Reorganization dated April 21, 2010 [Docket No. 194], because the Debtor did not file a complete plan that day.  Rather, it filed a precursor of a plan that had as a component a bidding procedures motion that relied in turn on an asset purchase agreement that

to be conducted under a confirmed Plan. Lender and all parties in interest should be afforded the opportunity to take discovery on all issues relevant to Plan confirmation.

50.     At an absolute minimum, any hearing on this Motion should only take place following the Court's approval of the yet-to-be-filed disclosure statement. It is virtually impossible for the Lender (or any other creditor) to conduct any meaningful analysis of the Stalking Horse Agreement, the attendant Bid Procedures, and applicable values absent a Court approved disclosure statement (let alone absent a fully documented and executed asset purchase agreement for the Stalking Horse's bid).

> **1.     The Bid Procedures Should Be Denied Because They Assume That a Sale is the Appropriate Primary Component of a Plan to be Confirmed by this Court.**

51.     The Debtors have failed to even argue that a sale of the Hotel is in the interest of the Lender or the other creditors of their estates. Nonetheless, the Debtors have proposed a sale of the Hotel and related assets, even though the proposed sale would benefit no one other than the Stalking Horse and certain of the Debtors' insiders. Even if the Debtors protest that another bidder may win the auction, they have made no showing that going down the path toward an auction (whether the Debtors' version or any other) makes any economic sense for the Lender, unsecured creditors, or other key constituencies in this chapter 11 case. The Lender submits that it may be able to propose a different route, most likely in a form of a competing Plan, which will provide a better resolution to this case for all of the creditors, including the unsecured creditor class and the Lender.

---

(continued)
was not filed until June 22, 2010, and that even to this day has neither full schedules nor signatures.

2.      **The Bid Procedures Must Be Subject to Strict Scrutiny;
Deferral to the Debtors' Business Judgment is Not
Appropriate.**

52.     The Debtors have failed to demonstrate that they have engaged in a
process designed to maximize the value of their assets, the paramount goal of the auction
process. *See, e.g., In re Integrated Res., Inc.*, 135 B.R. 746, 750 (Bankr. S.D.N.Y. 1992),
*aff'd* 147 B.R. 650 (S.D.N.Y. 1992) ("When a debtor desires to sell an asset, its main
responsibility, and the primary concern of the bankruptcy court, is the maximization of
the value of the asset sold."). Such failure calls into question the Stalking Horse
Agreement and the proposed Bid Procedures. Although cursorily, the Debtors have
disclosed their insider connections to the Stalking Horse. What they have failed to
disclose is their insider's potential improper influence over what may have been a very
suspect marketing process and the facts and circumstances which culminated in the
Stalking Horse Agreement. Likewise, conspicuously absent from the Bid Procedures
Motion is any discussion of the Debtors' discussions or negotiations with other parties in
interest and any potential alternatives to the Stalking Horse transaction. Discovery on
these issues is required. Given these circumstances, the proposed sale is subject to a
heightened level of scrutiny, and simple deference to the Debtors' business judgment is
not appropriate. *See In re Bidermann Indus. U.S.A., Inc.*, 203 B.R. 547, 551 (Bankr.
S.D.N.Y. 1997), *quoting C&J Clark Am., Inc. v. Carol Ruth, Inc.* (*In re Wingspread
Corp.*), 92 B.R. 87, 93 (Bankr. S.D.N.Y. 1988) ("sales to fiduciaries in chapter 11 cases
are not *per se* prohibited, 'but [they] are necessarily subjected to heightened scrutiny
because they are rife with the possibility of abuse.'"). *See also In re Kreisler*, 546 F.3d
863, 867 (7th Cir. Ill. 2008) ("Courts subject the dealings of an insider to 'rigorous

scrutiny' for inequitable conduct.") (citations omitted); *Hower v. Molding Sys. Eng'g Corp.*, 445 F.3d 935, 939 (7th Cir. 2006) (noting that the "sale of a debtor's property to an insider is subject to close scrutiny" (citing *In re Firstmark Corp.*, 46 F.3d 653, 656 (7th Cir. 1995)). Indeed, the questionable marketing effort and Stalking Horse arrangement informs the review of the proposed Bid Procedures.

### 3.   The Proposed Bid Procedures Are Improper Because They Limit Optionality and Reserve Complete Discretion to the Debtors Over Critical Elements of the Process.

53.   The proposed Bid Procedures require any interested party to subscribe to the terms and conditions of the Plan. In order to be deemed a "Qualified Bidder," section c.ii.(B) of the Bid Procedures requires that the person submit an offer letter under which it confirms that it is prepared to consummate the transaction, by a date certain, following the "entry of an order confirming the Plan and approving the Plan Sale of the Assets . . . ." (Motion, at 12.) Section c.v. of the Bid Procedures requires that all "bids must provide for funding of all payments required under the Plan to be funded by the purchaser." (*Id.* at 13.) Given the issues at stake, the vagueness of the foregoing clause is astounding; nonetheless, it would appear to require each "Qualified Bidder" to agree to fund the profit participation and all other elements of the Plan. The Debtors have not explained why requiring potential bidders to adhere to the Plan will serve to maximize the value of the auctioned assets. Indeed, the Lender sees no valid reason why the Debtors are not proceeding with an auction sale under section 363 of the Bankruptcy Code. Of course, the Debtors have an invalid reason — their desire to preclude credit bids.

54.    The Bid Procedures vest the Debtors with unfettered discretion over the entire process.  However, given their insider connections, it is questionable whether the Debtors can be fair and impartial in their decisions.   Under the Bid Procedures, the Debtors are empowered "in their sole discretion" to, among other things: (i) determine the universe of "Potential Bidders"; (ii) negotiate the terms of any potential bid; (iii) determine whether any Potential Bidder qualifies as a "Qualified Bidder"; (iv) control the due diligence process; (v) modify the terms of the auction; and, most importantly, (vi) "identify the highest and best bid."   (Bid Procedures, sections (b)(ii), (b)(iv), (d), (i), (m).)  Although the Bid Procedures call for the Debtors to consult with the Lender, the Debtors are free to ignore any such input from these stakeholders.  Given the Debtors' involvement on both sides of the Stalking Horse transaction, and the unilateral decision-making authority the Debtors seek to retain, there is a substantial risk that the Debtors will shape the outcome of the auction at the expense of their estates and creditors.  At a minimum, the Lender must be given a meaningful role in the process.

55.    Although the Bid Procedures Motion fails to identify a proposed schedule for the auction process, given the tight deadlines imposed by the Stalking Horse Agreement and the Debtors' acknowledgement in the Bid Procedures Motion that they intend to furnish the minimum notice requirements of the Bankruptcy Rules (Motion, at ¶¶ 37-39), the Debtors apparently intend to pursue a fast track confirmation after dithering for almost a year.  If that is the case, it is questionable whether there will be sufficient time to conduct a meaningful auction process that allows potential bidders a full and fair opportunity to conduct due diligence.  Any proposed schedule must offer

prospective interested parties a full and fair opportunity to conduct due diligence, engage the Debtors in negotiations, and submit competing bids.

### 4. The Stalking Horse Bid Protections Are Improper.

56. By the Debtors' own admissions, this is an insider deal. Moreover, as noted above, the Lender questions the circumstances which gave rise to the proposed transaction. The Debtors have failed to show how the proposed Break-Up Fee of $1,425,000 and $250,000 Expense Reimbursement will enhance the value of these estates. *See In re S.N.A. Nut Company*, 186 B.R. 98, 102 (Bankr. N.D. Ill. 1995) (noting that break-up fees should "enhance" the bidding and be reasonable in relation to the bidder's efforts and the size of the transaction); *Calpine Corp. v. O'Brien Envtl Energy, Inc. (In re O'Brien Envtl Energy, Inc.)*, 181 F.3d 527 (3d Cir. 1999) (holding that the allowance of a break-up fee was subject to the standard for allowance of an administrative priority claim under section 503(b) of the Bankruptcy Code; that is, the fees must be necessary to preserve the value of the bankruptcy estate); *In re Reliant Energy Channelview LP*, 594 F.3d 200 (3d Cir. 2010) (same, and clarifying that to preserve the value of the estate, the break-up fee must have either induced or preserved a bidder's bid). If anything, the Stalking Horse's alliance with the Debtors' insiders and the fact that the Debtors have elected to proceed with a Plan sale may deter prospective bidders. Particularly in the current environment, parties in interest may be reluctant to commit capital and engage in a sale process of uncertain duration which is subject to the vagaries of the confirmation process.

**D.      In Combination, the Bid Procedures, Stalking Horse Agreement, and Plan Are Premised Upon an Impermissible Surcharge Of Collateral.**

57.      Absent an express agreement to the contrary, the expenses associated with administering a bankruptcy estate generally are not chargeable to a secured creditor's collateral or claim, but must be borne out of the unencumbered assets of the estate. *See, e.g., In re Trim-X, Inc.*, 695 F.2d 296, 301 (7th Cir. Ill. 1982).  One exception to this general rule is stated in section 506(c), which permits a trustee to recover administrative expenses from a secured creditor's collateral if three conditions are satisfied:   (i) the expenses are "necessary" to preserve or dispose of the collateral, (ii) they are "reasonable," and (iii) the incurrence of the expenses provided a "benefit" to the secured creditor.  Expenses also may be recoverable where the secured creditor expressly or impliedly consented to the incurrence of the expense, or caused the expense. *Id.*

58.      It is undisputed that the Lender holds valid liens on substantially all of the Debtors' assets (the "Collateral"), including real estate and cash.  The Stalking Horse Agreement is premised upon a surcharge of the Lender's Collateral under section 506(c), although nowhere in the Bid Procedures Motion do the Debtors seek the required express authority for such surcharge. *See Ungaretti & Harris LLP v. Steinberg*, Nos. 07 C1292, 07 C 1293, 2008 U.S. Dist. LEXIS 17764, at *17 (N.D. Ill. Mar. 5, 2008) (stating that the bankruptcy court must approve section 506(c) surcharges).  Specifically, the Debtors seek to use the proceeds from the sale of the Collateral to pay FBR's allowed administrative expense claim, any Break-Up Fee, the Expense Reimbursement, contract cure claims, and to reimburse expenses arising from the sale.  The Debtors also propose to use the Debtors' Cash on Hand to pay in full "all administrative expense claims (other than FBR's claim), any miscellaneous secured claims, any priority tax claims, any

miscellaneous priority claims," any cure costs associated with the assumption of executory contracts or unexpired leases, as well as potentially subordinate liens.

59.     The Debtors have the burden of proving, by a preponderance of the evidence, that the expenses incurred satisfy the requirements of section 506(c). *In re Lunan Family Restaurants Ltd. Partnership*, 192 B.R. 173, 178 (Bankr. N.D. Ill. 1996). The Debtors have made no argument that they are entitled to surcharge the collateral and, in any case, such an argument must fail. The Lender certainly has not consented to the expenses proposed to be incurred under the Stalking Horse Agreement, nor have they caused such expenses. Further, the Debtors cannot demonstrate that the proposed expenses to be charged to the Collateral were necessary, reasonable, and incurred to benefit the Lender.

60.     "Necessary costs are those which are unavoidably incurred in the preservation or disposal of the secured property." *See, e.g., id.* at 180 (citing *In re Chicago Lutheran Hospital Ass'n*, 89 B.R. 719, 727-28 (Bankr. N.D. Ill. 1988)). Whether the costs sought under section 506(c) are reasonable is often determined by a comparison of the costs to the costs which the secured creditor would have incurred in foreclosing on the property on its own behalf. *In re Chicago Lutheran*, 89 B.R. at 727. The Debtors have provided no evidence that any of the proposed expenses incurred in connection with the Plan Sale and the Stalking Horse Agreement are unavoidable, or that they are reasonable. Even if the Debtors were to prevail on both these points, however, they are not entitled to surcharge the Collateral because they cannot establish that the expenses were incurred as a part of efforts that "provided a quantifiable actual benefit that accrued primarily to the [Lender]." *Lunan Family*, 192 B.R. at 179.

61.   A secured creditor is deemed to have received a "benefit" within the meaning of section 506(c) if the relevant expense preserved or increased the value of its collateral. "The key factor for determining whether expenses are recoverable is whether they were incurred <u>primarily</u> for the benefit of the secured creditor." *In re Standard Foundry Prods.*, No. 96 C 92301998 U.S. Dist. LEXIS 16569, *10-11 (N.D. Ill. Oct. 14, 1998) (citing *In re Chicago Lutheran*, 89 B.R. at 728) (emphasis added).   "[C]ourts construe the term 'benefit' narrowly," as "the secured creditor cannot be required to bear the expenses which benefit the entire estate under the theory that the expenses were incurred to preserve the assets of the estate as a whole." *Id.* at *11.  As argued elsewhere in this Objection, the only party that will benefit from the sale of the Collateral pursuant to the Stalking Horse Agreement is the Stalking Horse.   The Lender should not and cannot be required to bear expenses incurred as a result of the sale via a process that will not benefit them.

## IV. CONCLUSION

WHEREFORE, the Lender respectfully requests that this Court (a) deny the Bid Procedures Motion and (b) grant such other and further relief as the Court deems just and proper.[13]

---

[13] To the extent that this Objection is construed as a "brief" under Local Rule 5005-3(C), the Lender respectfully requests that the Court waive that rule's 15-page limitation.

Dated: July 8, 2010

Chicago, Illinois

Respectfully submitted,

AMALGAMATED BANK, as Trustee of
Longview Ultra Construction Loan
Investment Fund, f/k/a Longview Ultra I
Construction Loan Investment Fund, in its
capacity as administrative agent for itself
and San Diego National Bank, now part of
U.S. Bank National Association


By: */s/ Mary E. Olson*
          One of its Attorneys

John W. Costello (Atty. No. 522406)
Mary E. Olson (Atty. No. 6297334)
Wildman, Harrold, Allen & Dixon LLP
225 West Wacker Drive, Suite 2800
Chicago, Illinois 60606-1229
Tel: (312) 201-2000
Fax: (312) 201-2555
E-mail:  costello@wildman.com
             molson@wildman.com

-and-

Adam A. Lewis
Morrison & Foerster LLP
425 Market Street
San Francisco, California 94105-2482
Tel: (415) 268-7000
Fax: (415) 268-7522
E-mail:  alewis@mofo.com

Norman S. Rosenbaum
Erica J. Richards
Morrison & Foerster LLP
1290 Avenue of the Americas
New York, NY  10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
nrosenbaum@mofo.com
erichards@mofo.com