IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| In re: <br><br> RADLAX GATEWAY HOTEL, LLC, et al., <br><br> Debtors. | Chapter 11 <br> Case No. 09-30047 <br> (Jointly Administered) <br><br> Hon. Bruce W. Black |

**SUPPLEMENTAL OBJECTION OF AMALGAMATED BANK, AS TRUSTEE OF THE LONGVIEW ULTRA CONSTRUCTION LOAN INVESTMENT FUND TO DEBTORS' MOTION FOR AN ORDER: (A) APPROVING PROCEDURES FOR THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS; (B) SCHEDULING AN AUCTION; (C) APPROVING ASSUMPTION AND ASSIGNMENT PROCEDURES; (D) APPROVING FORM OF NOTICE; AND (E) GRANTING RELATED RELIEF**

Amalgamated Bank, as Trustee of the Longview Ultra Construction Loan Investment Fund, ("Amalgamated" and collectively with U.S. Bank, f/k/a San Diego National Bank, the "Lenders") hereby submits the following Supplemental Objection with respect to the Motion of RadLAX Gateway Hotel, LLC and RadLAX Gateway Deck, LLC (together, the "Debtors") for an Order: (A) Approving Procedures for the Sale of Substantially All of the Debtors' Assets; (B) Scheduling an Auction; (C) Approving Assumption and Assignment Procedures; (D) Approving Form of Notice; and (E) Granting Related Relief [Docket No. 206] (the "Bid Procedures Motion").[1]

## I. INTRODUCTION

In the Bid Procedures Motion, the Debtors contend that the Lenders should be barred from credit-bidding at the foreclosure sale of the subject property "for cause," pursuant to 11 U.S.C. §§ 1129(b)(2)(A)(ii) and 363(k). In support of their "for cause" argument, the Debtors allege that the Lenders precipitated the Debtors' bankruptcy "by

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Bid Procedures Motion.

improperly terminating the Debtors' funding under the Loan." Bid Procedures Motion, at ¶ 29. Specifically, the Debtors allege that the Lenders were fully aware of the Debtors' decision to add an eighth level to the Parking Deck ("Parking Deck Modification"), thereby expanding the budget for the project. *Id.* The Debtors further allege that, even though a written modification of the loan agreement to finance the increased scope of the project was never realized, the Lenders "expressly approved and funded construction draw requests throughout the course of the Loan." *Id.* The Debtors insinuate that this continued funding constituted a tacit approval of the Debtors' Parking Deck Modification, obligating the Lenders to fund the Debtors' additional financing needs beyond those provided for in the loan agreements and rendering the Lenders' subsequent declarations of default and termination of funding improper. It is on this basis, among others, that Debtors seek to bar Lenders from credit-bidding under the above-referenced Bankruptcy Code provisions.

Per the terms of the November 2007 Construction Loan Agreement by and between the Debtors and Amalgamated, operating in its capacity as Agent for the Lenders (the "RadLAX Loan Agreement"), the RadLAX Loan Agreement is governed by "the laws of the State of California." RadLAX Loan Agreement, at § 9.8. As such, California law governs any actions arising out of or related in any way to the RadLAX Loan Agreement, including the Debtors' allegations that the termination of the subject Loan was improper. Under California law, the Lenders' actions, as alleged and insinuated by the Debtors, do not subject the Lenders to liability and, thus, do not constitute grounds for the Court to prevent Lenders from credit-bidding "for cause."

There are no other grounds to deny Lenders their statutory right to credit bid in any auction of the Debtors' properties should they choose to do so. Moreover, denying credit bidding will confer absolutely no benefit on the Debtors' estates or creditors. Excluding the Lenders from the auction process in this manner will inure to the sole

ny-937937                                  2

benefit of one party - - the prevailing bidder who may very well be the Stalking Horse and its insider partners.

## II. ARGUMENT

### A. Under California Law, the Lenders Are Not Subject to Liability with Respect to the Debtors

For California transactions, there are eight primary theories of lender liability: (1) Breach of Contract; (2) Fraud; (3) Duress; (4) Negligence; (5) Conversion; (6) Defamation; (7) Infliction of Emotional Distress; and (8) Statutory Liability. 2 Roger Bernhardt, Mortgages, Deeds of Trust, and Foreclosure Litigation §§ 12.2-12.11 (4th ed. 2010). Related to these primary theories are additional developing theories of liability: (1) Constructive Fraud on the Basis of Fiduciary Duty; (2) Breach of the Covenant of Good Faith and Fair Dealing; (3) Unfair Business Practices; and (4) Improper Control Over the Borrower. *Id.* at §§ 12.12-12.26.

With respect to the instant matter, Debtors essentially allege that the Lenders led the Debtors down a primrose path, providing assurances that the "out of balance" condition of the RadLAX Loan caused by the Parking Deck Modification would be resolved come what may, but all the while planning to declare a default and terminate funding when times turned tough for San Diego National Bank. Such allegations clearly sound in the fraud theory of lender liability, either as a breach of the Lenders' fiduciary duty to the Debtors or the perpetration of an actual fraud, upon which the Debtors justifiably relied.

### 1. The Lenders Are Not Liable For Constructive Fraud Because They Do Not Owe Debtors a Fiduciary Duty

Under California law, a private lender acting in a fiduciary capacity toward a borrower can be liable for constructive fraud. *See Warren v. Merrill*, 143 Cal. App. 4th 96 (2006). In pertinent part, California Civil Code § 1573 provides, "Constructive fraud

ny-937937                                    3

consists [of] any breach of duty which, without an actually fraudulent intent, gains an advantage to the person in fault . . . by misleading another to his prejudice . . . ." Cal. Civ. Code § 1573. Arguing for lender liability under this theory, the Debtors must demonstrate that the Lenders, without necessarily intending to defraud, gained an advantage with respect to the Debtors (arguably the increased value of the Lenders' collateral) by leading them to believe that cost overrun issues associated with the Parking Deck Modification would be worked out. In order to succeed on a claim for constructive fraud, however, the Debtors must also demonstrate that they were in a fiduciary relationship with the Lenders. In truth, no such fiduciary relationship existed.

In California, a lender in an ordinary relationship with a borrower is not a fiduciary. *See River Colony Estates Gen. P'ship v. Bayview Fin. Trading Grp.*, 287 F. Supp. 2d 1213, 1224 (S.D. Cal. 2003) ("A lender does not owe a borrower or third party any duties 'beyond those expressed in the loan agreement, excepting those imposed due to special circumstance or a finding that a joint venture exists.'"); *see also Peterson Dev. Co. v. Torrey Pines Bank*, 233 Cal. App. 3d 103, 119 (1991) ("[T]he general rule is 'a lender does not assume any obligations regarding the viability of the project or investment which is financed by the loan funds as long as the conduct of the lender is limited to the activities which customarily are associated with the lending function.'"). "It is only in the *exceptional* case, with something more involved than a basic commercial relationship, that a court will impose fiduciary duties on the lender." Bernhardt at § 12.15.

In the context of the RadLAX Loan, Debtors have not alleged that the relationship between the Lenders and the Debtors is anything more than the ordinary relationship between a lender and a borrower. As such, Debtors are precluded from arguing that the Lenders breached a fiduciary duty to the Debtors and, in turn, are precluded from arguing that the Lenders are liable for constructive fraud.

ny-937937                                             4

Document      Page 5 of 13

## 2. The Lenders Are Not Liable for Actual Fraud Because the Debtors Cannot Establish Justifiable Reliance

In the alternative, Debtors may argue that the Lenders perpetrated an actual fraud on the Debtors by making negligent or intentionally false assurances of future resolution of the issues associated with the "out of balance" condition of the RadLAX Loan. The matter of *Kruse v. Bank of Am.*, 202 Cal. App. 3d 38 (1998) proves instructive on this issue.

In *Kruse*, the borrower, Jewell, sought long-term financing for his loans from the Bank. Jewell submitted this request to one of the Bank's branch managers, Sullivan, someone whom Jewell knew did not have final approval authority. *Id.* at 48-49. In response to Jewell's request and over the course of their interactions, Sullivan provided vague assurances to Jewell along the lines of, "something [will] be worked out," "we're going to be able to help you," and "Don't worry . . . we'll take care of you." *Id.* at 48-51. On the assumption that the Bank would indeed provide the requested financing, Jewell undertook substantial short-term loan obligations from the Bank. Ultimately, however, the Bank decided not to provide Jewell with the requested long-term financing. In turn, Jewell sued the Bank, alleging fraud, among other causes of action. Finding in favor of the Bank, the California Court of Appeal held:

> Our review of the record fails to disclose evidence of sufficient substantiality to establish the essential element of justifiable reliance. Testimony concerning one's own reliance is legally insufficient evidence if such reliance is without justification; a party plaintiff's misguided belief or guileless action in relying on a statement on which no reasonable person would rely is not justifiable reliance. . . . Quite simply, the Jewells' hopeful expectations cannot be equated with the necessary justifiable reliance.

*Id.* at 54-55 (internal citations omitted). In short, the court held that "justifiable reliance" is a necessary component to a lender liability fraud claim. If a borrower cannot

ny-937937                                         5

demonstrate that its reliance on a lender's allegedly fraudulent statements was justifiable, lender liability will not be found. In *Kruse*, Jewell's inability to establish justifiable reliance doomed his claim for bad faith denial of a contract as well. In pertinent part, the court noted:

> Here, the entire subject matter under consideration – the long-term loan – was at best left open to future negotiations and agreement. . . . The Jewells' hopeful expectation that a loan agreement would eventually be reached was simply that: an expectation. The Bank's manifestation of assent never materialized; and no agreement was ever formed. Under such circumstances, the Bank was under no legal obligation or commitment to make a long-term loan.

*Id.* at 59. The application of *Kruse* to the arguments set forth in the Debtors' Bid Procedures Motion is readily apparent. At all relevant times, the Debtors were aware of the fact that financing for the Parking Deck Modification had not been secured or even promised by the Lenders and that the loan modification process required two levels of committee approval for Amalgamated, as well as the approval of San Diego National Bank. Only after these approvals were received could a modification be binding and memorialized pursuant to § 9.7 of the RadLAX Loan Agreement.[2] In light of the foregoing, Debtors cannot plausibly argue that their reliance on the Lenders' continued funding of the RadLAX Project was justifiable. Indeed, the evidence will show that although the Lenders were actively engaged with the Debtors in trying to arrive at an agreement to modify the Loan Agreements through negotiations and the approval process, the Debtors knew that the approvals were necessary and understood that the Lenders were not legally bound until and unless the necessary approvals were obtained. The evidence will also show that the Lenders and the Debtors could not agree on modified terms, with each side finding various aspects of the other side's proposals

---

[2] § 9.7 of the RadLAX Loan Agreement provides, "This Agreement shall not be amended, waived, discharged or terminated orally but only by an instrument executed by the party against which enforcement of the amendment, waiver, discharge or termination is sought." RadLAX Loan Agreement, at § 9.7.

unacceptable. In turn, the Debtors are barred from arguing that the Lenders' actions constituted fraud and, thus, have no basis for lender liability under California law.[3]

### B. Under California Law, the Lenders Are Not Subject to Liability with Respect to the Contractors on the RadLAX Project

In support of their Bid Procedures "for cause" argument, the Debtors may also argue that the Lenders wrongfully encouraged contractors and sub-contractors on the RadLAX Project to continue working by providing them with false assurances of future payment, in spite of the "out of balance" condition of the RadLAX Loan and the termination of funding.

Generally speaking, California Civil Code § 3264 limits the rights of contractors to recover from lenders to mechanic's lien foreclosure and stop notice enforcement causes of action. However, contractors are not limited from alleging lender liability if their claims exist independently in tort. *See Cal-West Nat'l Bank v. Superior Court*, 185 Cal. App. 3d 96, 100 (1986) ("[S]ection 3264 has no application to claims of personal liability against construction lenders on account of their allegedly wrongful diversion of construction loan funds."); *see also Nibbi Bros., Inc. v. Home Fed. Sav. and Loan Ass'n*, 205 Cal. App. 3d 1415, 1422 (1988) ("The critical allegation is that Home actively *induced* Nibbi to provide the work. In an appropriate cause, such inducement may provide a cause of action distinct from that of an equitable lien. Section 3264 surely was not intended to give lenders impunity to pursue any stratagem at the expense of contractors and subcontractors.") (emphasis in the original).

But *Nibbi* does not afford the Debtors any grounds for relief. The case provides useful insight into how California courts address contractor claims of lender liability. In

---

[3] Any other result would, incidentally, punish the Lenders for being willing to try to accommodate the Debtors' desire to forge ahead with their new plans by allowing the Debtors to draw on the approved loan amount while engaging in negotiations with them for modifying the existing agreements subject to the approvals that the Debtors unequivocally *knew* the Lenders had to obtain. This penalty for the Lenders' willingness to try to work with the Debtors, rather than the Lenders' conduct, would be inequitable.

*Nibbi*, defendant-lender, Home Federal Savings & Loan Association ("Home") extended a secured loan to a borrower for a series of construction projects. The borrower, in turn, contracted with Nibbi to make improvements to one of the properties. Prior to beginning work on the project, Home assured Nibbi that sufficient loan funds existed to finance the project. A few months after work had begun, Home recorded a notice of default on the deed of trust securing the loan and suspended payments. At the same time, Home informed Nibbi that it "would be paid for work performed" and should continue working. With this assurance, Nibbi continued to work on the project, but was never paid. Almost a year after the project first began, Home acquired the property at a private foreclosure sale and was subsequently sued by Nibbi to recover the value of services and materials rendered. *Id.* at 1419.

On appeal, Nibbi challenged the trial court's decision to sustain Home's demurrer to Nibbi's unjust enrichment and negligent misrepresentation causes of action. Addressing these issues, the Court of Appeal noted:

> Nibbi contends that [Home's] assurance amounted to a misrepresentation on which it relied to its detriment. Its legal premise is sound: a contractor who confers a benefit on a construction lender in reliance on the lender's fraudulent misrepresentation may have a valid cause of action to recover the value of the benefit if the lender is in fact unjustly enriched by its performance. The difficulty in Nibbi's position lies in the allegations of an actionable misrepresentation.

*Id.* at 1423. Specifically, the court found that Home's assurance that Nibbi "would be paid for work performed" was insufficient to establish Home's liability. In pertinent part, the Court held:

> In tort law, a representation ordinarily will give rise to a cause of action for fraud or deceit only if it is a representation of fact rather than opinion. "[Predictions] as to future events, or statements as to future action by some

> third party, are deemed opinions, and not actionable fraud."
> . . . The most that we can derive from the vaguely worded language is that Home optimistically assessed the developer's capacity to sustain continued financing. A representation of this sort constitutes a nonactionable expression of opinion.

*Id.* (alteration in the original) (internal citations omitted). As with *Kruse*, the application of *Nibbi* to the arguments, both express and implied, as set forth in the Debtors' Bid Procedures Motion is readily clear. In the instant matter, the Lenders contend that they provided no assurances whatsoever to contractors or sub-contractors regarding payment for past or future services rendered on the RadLAX Project. If they said anything at all, it was at most that they were working with the Debtors to try to find a solution to the Debtors' problems. Even had the Lenders made comments to that effect, the California Court of Appeal's decision in *Nibbi* demonstrates that vague assurances of future payment do not expose a lender to potential liability and, in fact, are considered non-actionable expressions of opinion. As such, the Debtors cannot reasonably argue that the Lenders acted in an improper manner, with respect to the RadLAX contractors and sub-contractors, by declaring Debtors in default and terminating funding of the Loan. In turn, Debtors' argument to prevent Lenders from credit-bidding finds no support under California law.

### C. The Are No Other Bases to Deny Credit Bidding for Cause.

In addition to seeking to deny the Lenders the right credit bid based on allegations of "bad acts," Debtors assert that cause exists to deny credit bidding because of the potential for bid chilling. In addition, Debtors suggest that the existence of the mechanic's liens on the Hotel and related properties may also constitute cause.

Lenders respectfully refers this Court to their Objection to the Bid Procedures Motion (Dkt # 23) (the "Objection") wherein they fully address each of the Debtors'

contentions.  In brief, the mere allegations of what the Debtors refer to as the Lender's "inequitable conduct" cannot constitute cause to preclude credit bidding.  Moreover, as discussed above Debtor's theory is without basis in law, and as will be demonstrated at trial, without basis in fact.  Even where the Debtors' theory to have any merit, at a minimum, Debtors must demonstrate damages well in excess of the difference between the price at which they propose to sell the Hotel and related assets and the Lenders' claim to deny credit bidding outright.

Through their interpretation of the Lenders' pleadings, Debtors conclude that Lenders' intend to credit bid and if they do so, it will invariably be for the full amount of their debt.  Debtors' candidly acknowledge that as a consequence of the depressed value of the Hotel and related assets, any cash bids received (assuming there will actually be an auction) will be well below the value of the Lenders' claim.  Debtors' thus conclude that Lenders' participation in the auction will "undoubtedly" chill bidding.  *See* Debtors' Omnibus Reply at 19-21 (Dkt # 246).

First, assumptions about the Lenders' future conduct cannot possibly serve as the basis for "cause" under section 363(k) of the Bankruptcy Code.  Second, assuming the Debtors' are correct, and that credit bidding in the instant cases, or in the context of any bankruptcy auction, chills bidding, such a potential or actual effect, cannot constitute cause.  This tortured interpretation of the statute would render the substantive right to credit bid afforded to secured creditors under sections 363(k) and 112(b)(2)(A)(ii) of the Bankruptcy Code meaningless.  Third, despite having numerous opportunities to do so, Debtors have failed to demonstrate how precluding credit bidding will serve any interests other than those of the prevailing bidder.  Absolutely no residual value will flow to the Debtors' estates or unsecured creditors.

Lenders anticipate the Debtors, in another attempt at obfuscation, will argue that the existence of the mechanic's filed against their assets is yet another reason to deny credit bidding. As illustrated by the cases cited in the Objection, the bankruptcy courts take a flexible approach to these issues and where necessary, will condition credit bidding to account for potential competing liens, but not deny credit bidding altogether. In fact, in the companion Chapter 11 cases of *In re River Road Hotel Partners, LLC* (case no. 09 B 30029), certain holders of mechanic's liens have requested that the Lenders' be required to in effect secure the holders' claims through cash or letters of credit, as a condition to credit bidding, until such time as the validity and priority of the liens are determined by the state court. This is entirely consistent with the Court's decision to allow the state court to determine with this issue.

Similarly, this Court may simply direct that the Lenders or any other credit bidder, should they prevail in an auction through a credit bid, to take ownership of the Assets subject to the mechanic's liens. Such a result would preserve the status quo and all rights third parties allege to have in the collateral without unduly imposing on the Lender or any other party. The competing claims will then be determined by the state court and then claims against collateral can still be paid in their order of priority as long as collateral value holds out.

### III. CONCLUSION

In their Bid Procedures Motion, Debtors argue that because the Lenders improperly terminated funding under the Loan, they should be barred from credit-bidding "for cause." An examination of California lender liability law, however, undercuts the Debtors' argument. As evidenced above, the Lenders' alleged, express or implied, assurances of a resolution to the "out of balance" condition of the RadLAX Loan and assurances of future payment to contractors provide no basis for arguing in favor lender liability under California law. Absent proof of liability, the Debtors cannot reasonably

argue that "cause" exists to bar the Lenders from credit-bidding. No other cognizable cause exists, and accordingly, any auction of the Debtors' assets must as prescribed by section 363(k) of the Bankruptcy Code, allow for credit bidding.

Dated: August 20, 2010
      Chicago, Illinois

                              AMALGAMATED BANK, as Trustee of Longview Ultra Construction Loan Investment Fund, f/k/a Longview Ultra I Construction Loan Investment Fund, in its capacity as administrative agent for itself and San Diego National Bank, now part of U.S. Bank National Association

By: /s/ *Mary E. Olson*
      One of its Attorneys

John W. Costello (Atty. No. 522406)
Mary E. Olson (Atty. No. 6297334)
Wildman, Harrold, Allen & Dixon LLP
225 West Wacker Drive, Suite 2800
Chicago, Illinois 60606-1229
Tel: (312) 201-2000
Fax: (312) 201-2555
E-mail: costello@wildman.com
        molson@wildman.com

-and-

Adam A. Lewis
Morrison & Foerster LLP
425 Market Street
San Francisco, California 94105-2482
Tel: (415) 268-7000
Fax: (415) 268-7522
E-mail: alewis@mofo.com

Norman S. Rosenbaum
Erica J. Richards
Morrison & Foerster LLP
1290 Avenue of the Americas
New York, NY 10104

ny-937937                12

        Telephone: (212) 468-8000
        Facsimile: (212) 468-7900
        nrosenbaum@mofo.com
        erichards@mofo.com