## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | Case No. 09-30047 |
| RADLAX GATEWAY HOTEL, LLC, | ) | Jointly Administered |
| INC., *et al*. | ) | |
| | ) | Honorable Bruce W. Black |
| Debtors. | ) | |

## NOTICE OF MOTION

**TO:**   See attached Service List

**PLEASE TAKE NOTICE** that on November 18, 2010 at 10:00 a.m., or as soon thereafter as counsel may be heard, we will appear before the Honorable Bruce W. Black, or any judge sitting in his stead, in Room 615 of the Everett McKinley Dirksen Building, 219 South Dearborn Street, Chicago 60604, and present: **Motion of Lender for Relief from the Automatic Stay Pursuant to Sections 362(d)(1) and 362(d)(2) of the Bankruptcy Code and Bankruptcy Rule 4001 to Enforce Rights Against Collateral**.

AMALGAMATED BANK, as Trustee of Longview Ultra Construction Loan Investment Fund, f/k/a Longview Ultra I Construction Loan Investment Fund, in its capacity as administrative agent for itself and U.S. Bank National Association, in its own right and as the contractual and legal successor-in-interest with respect to certain loans formerly owned by San Diego National Bank

By:   */s/ Mary E. Olson*
         One of its Attorneys

John W. Costello (Atty. No. 522406)
Mary E. Olson (Atty. No. 6297334)
Wildman, Harrold, Allen & Dixon LLP
225 West Wacker Drive, Suite 2800
Chicago, Illinois 60606
Tel: (312) 201-2000
Fax: (312) 201-2555

-and-

Adam A. Lewis
Morrison & Foerster LLP
425 Market Street
San Francisco, California 94105-2482
Tel: (415) 268-7000
Fax: (415) 268-7522

Norman S. Rosenbaum
John A. Pintarelli
Morrison & Foerster LLP
1290 Avenue of the Americas
New York, NY  10104
Tel: (212) 468-8000
Fax: (212) 468-7900

## CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies that on November 12, 2010, I caused a true and correct copy of the **Motion of Lender for Relief from the Automatic Stay Pursuant to Sections 362(d)(1) and 362(d)(2) of the Bankruptcy Code and Bankruptcy Rule 4001 to Enforce Rights Against Collateral** and **Notice of Motion** to be served on all parties of record, at the addresses and method listed on the attached Service List.

By: *\_\_/s/ Mary E. Olson_____*
     One of Its Attorneys

Mary E. Olson (Atty. No. 6297334)
Wildman, Harrold, Allen & Dixon LLP
225 W. Wacker Drive, Suite 2800
Chicago, IL  60606
Telephone:  312-201-2000
Facsimile:  312-201-2555

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | Case No. 09-30047 |
| RADLAX GATEWAY HOTEL, LLC, | ) | Jointly Administered |
| *et al.* | ) | |
| | ) | Hon. Bruce W. Black |
| Debtors. | ) | |

**MOTION OF LENDER FOR RELIEF FROM THE AUTOMATIC STAY PURSUANT
TO SECTIONS 362(d)(1) AND 362(d)(2) OF THE BANKRUPTCY CODE AND
BANKRUPTCY RULE 4001 TO ENFORCE RIGHTS AGAINST COLLATERAL**

Amalgamated Bank, as Trustee of Longview Ultra Construction Loan Investment Fund,

f/k/a Longview Ultra I Construction Loan Investment Fund, in its capacity as administrative

agent for itself and U.S. Bank National Association, in its own right and as the contractual and

legal successor-in-interest with respect to certain loans formerly owned by San Diego National

Bank (collectively, the "Lender"), by and through its undersigned counsel, respectfully submits

this motion (the "Motion") for an order granting it relief from the automatic stay pursuant to

section 362(d) of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy

Code") and Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules")

to permit the Lender to enforce its rights as a secured creditor of debtors and debtors-in-

possession RadLAX Gateway Hotel, LLC ("Gateway Hotel") and  RadLAX Gateway Deck,

LLC ("Gateway Deck" and collectively with Gateway Hotel, the "Debtors").  In support of this

Motion, the Lender respectfully states as follows:

**PRELIMINARY STATEMENT**

Relief from the automatic stay is not only mandated under section 362(d), but warranted.

These chapter 11 cases are approaching their 15-month anniversary, but the Debtors' prospects

of consummating a plan are more remote than they were on day one.  From the outset, there has been little reason to believe that the Debtors could succeed in these cases given the enormous gap between the amount of the Lender's claim and the value of the collateral securing it.  Indeed, the underlying question really has been what is the point of chapter 11 proceedings in which the hard facts are that there is no value for *any* party in interest save the Lender and any senior lien holders.  Nevertheless, in the hope that there could be a mutually beneficial outcome, the Lender stayed on the sidelines in these chapter 11 cases for almost a year.  The Lender was rewarded for its tolerance by an ill-conceived liquidating Plan (defined below) which sought to sell the Hotel Properties (defined below) for a fraction of their construction costs and cram down the Lender through a no credit bid sale that would have benefited only the insider-related stalking horse bidder by affording it the opportunity to purchase the Debtors' assets at decidedly below-market values.

Reflecting the legitimate function of a chapter 11 case, the Debtors' scheme to keep themselves in the picture went awry when this Court denied their Bid Procedures Motion (defined below) and terminated the Debtors' plan exclusive periods.  Choosing to ignore the Lender's numerous objections to their proposed Plan, the Debtors now pin their only and last hope on the appellate process, the outcome of which is at best uncertain.  The Debtors have no other alternatives.  As this Court noted in its recent order certifying the appeals, a plan under which there is no credit bidding appears to be the only "realistic hope the debtors have to confirm a plan in chapter 11" because of the massive secured debt/value gap.  *See* Certification for Direct Appeal to Court of Appeals for the Seventh Circuit [Dkt. No. 362] (the "RadLAX Certification") (referring to *In re River Road Hotel Partners, LLC*, Certification for Direct Appeal to Court of Appeals for the Seventh Circuit, Case No. 09-30029, Bankr. N.D. Ill., [Dkt.

No. 500] p.3, ¶8 (the "River Road Certification")).  However, even were the Debtors to prevail on appeal, the Plan advanced by the Debtors is, on account of its many defects, some obvious on its face, patently unconfirmable.

Nonetheless, assuming that a "no credit bid scenario" could potentially provide the Debtors with the theoretical underpinnings of a confirmable plan over the Lender's objection, after spending fifteen months in chapter 11 (plus however much additional time it takes for disposition of the appeal), the vast uncertainty surrounding the Debtors' prospects of getting to the point where they could propose such a plan, establishes more than sufficient grounds for relief from the automatic stay.  In short, there is no equity in the Hotel Properties and the Debtors lack any prospect - let alone a convincing one that meets the Debtors' burden of proof - of confirming a feasible plan within a reasonable amount of time.  Accordingly, the well-developed law applying section 362(d)(2) of the Bankruptcy Code mandates stay relief for the Lender.

The Debtors have not sought and do not seek any genuine reorganization or liquidation, but rather have focused exclusively on attempting to sell the Hotel Properties under bid procedures proposing an insider-related stalking horse buyer at a fraction of their construction costs and at a price not tied to any appraisal or other objective measure of value.  Although counsel for the Debtors did mention the possibility of a stand-alone reorganization at the August 30, 2010 status conference, during the more than two months since that hearing, however, the Debtors have neither filed nor proposed such a plan.  Rather, it is abundantly clear that their sole objective is the pursuit of a plan and sale process that would prohibit credit-bidding, assuming that they succeed on appeal many months from now.

The Debtors' reliance upon this stalled liquidation, rather than a reorganization or alternative liquidation proposal, underscores why the automatic stay must be lifted in this case.

Section 362(d)(2) requires that the stay shall be lifted if (A) the debtor has no equity in the collateral, a fact that is unquestioned here, and (B) "such property is not necessary to an effective reorganization ....".  The Debtors utterly fail to meet the second prong of section 362(d)(2) because an effective reorganization by the Debtors is simply not possible.  Instead, the Debtors pursue a quixotic attempt to win under a "no credit-bidding" plan that is riddled with infirmities, and which may not be presented to this Court again - if at all – until the Debtor has prevailed on the credit-bidding issue on appeal many months from now.  That outcome is not only far away, it is also far from certain.  Accordingly, granting relief from the stay to allow the Lender to exercise rights in its collateral is required at this time.

In addition, under section 362(d)(1) of the Bankruptcy Code, "cause" exists for relief from the automatic stay because the Lender's interest in their collateral is not adequately protected.  The Hotel Properties are declining in value and the Debtors' cannot meet their burden of demonstrating that the Lender is adequately protected.

## JURISDICTION AND VENUE

1.     This Court has jurisdiction over the subject matter of the Motion pursuant to 28 U.S.C. §§ 157 and 1334(b) and the standing order of reference of the district court.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue in this Court is proper under 28 U.S.C. §§ 1408 and 1409.

2.     The statutory and procedural predicates upon which relief is requested are sections 362(d) and 362(g) of the Bankruptcy Code and Bankruptcy Rule 4001(a)(1).

## BACKGROUND

3.    On August 17, 2009 (the "Petition Date"), the Debtors and certain affiliated entities filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The cases are jointly administered.

4.    An official committee of unsecured creditors has not been appointed in the chapter 11 cases.

5.    Debtor Gateway Hotel owns the Radisson Hotel at Los Angeles International Airport (the "Hotel") and Debtor Gateway Deck owns a parcel of real estate adjacent to the Hotel upon which it had been constructing a parking structure prior to the Petition Date (the "Parking Deck", and together with the Hotel, the "Hotel Properties").

6.    The Hotel Properties are encumbered by (i) that certain Construction Loan Deed of Trust, Security Agreement and Assignment of Leases and Rents dated as of November 1, 2007 (the "Hotel Deed of Trust") executed by Gateway Hotel and recorded on November 2, 2007 in the official records of Los Angeles County, California as Document No. 20072474562, and (ii) that certain Construction Loan Deed of Trust, Security Agreement and Assignment of Leases and Rents dated as of November 1, 2007 (the "Deck Deed of Trust", and together with the Hotel Deed of Trust, the "Deeds of Trust")[1] executed by Gateway Deck and recorded on

---

[1] In addition to the Deeds of Trust, the Loan is secured by (i) that certain UCC-1 Financing Statement, naming Gateway Hotel, as debtor, and Amalgamated Bank, in its capacity as Agent, as secured party, filed on November 2, 2007 with the Secretary of State of Delaware as Document No. 20074190781; (ii) that certain UCC-1 Financing Statement, naming Gateway Deck, as debtor, and Agent, as secured party, filed on November 2, 2007 with the Secretary of State of Delaware as Document No. 20074190798; (iii) that certain Assignment of Rents and Leases dated as of November 1, 2007 executed by Gateway Hotel and recorded on November 2, 2007 in the official records of Los Angeles County, California as Document No. 20072474564, and (iv) that certain Assignment of Rents and Leases dated as of November 1, 2007 executed by Gateway Deck and recorded on November 2, 2007 in the official records of Los Angeles County, California as Document No. 20072474563; (v) that certain Environmental Indemnity Agreement dated as of November 1, 2007, by and among the Debtors, RadLAX Gateway Bossy Holdings, LLC, RadLAX Gateway Dumon Holdings, LLC, and RadLAX Gateway Project Management, LLC; (vi) that certain Assignment of Plans, Specifications, Construction and Service Contracts, Permits and Licenses dated as of November 1, 2007 executed by Gateway Hotel; (vii) that certain Assignment of Plans, Specifications, Construction and Service Contracts, Permits and Licenses dated as of November 1, 2007 executed by Gateway Deck; (viii) that certain Assignment and Subordination of Development and Construction Management Agreement dated as of November 1, 2007 executed by Gateway Hotel; (ix) that certain Assignment and Subordination of

November 2, 2007 in the official records of Los Angeles County, California as Document No. 20072474561, securing a $142,000,000 construction loan (the "Loan") from the Lender made in accordance with that certain Construction Loan Agreement dated November 1, 2007 (the "Loan Agreement") by and among the Debtors (individually and collectively, jointly and severally), and Lender.   Copies of the Deeds of Trust, Loan Agreement and the Additional Collateral Documents are annexed hereto as Exhibits "A", "B" and "C", respectively.

7.   As of the commencement of the cases, the Lender's claims totaled at least $130,000,000, with interest accruing at about $1.5 million a month.  (See Claim Nos. 13-1 and 99, filed February 14, 2010.)

8.   Pursuant to the Collateral Documents, the Lender holds essentially a blanket lien on all of the Debtors' assets, including the Hotel Properties and the proceeds thereof (collectively, the "Collateral").  The cash the Debtors generate is the Lender's cash collateral (the "Cash Collateral") within the meaning of section 363(a) of the Bankruptcy Code.   During the pendency of the chapter 11 cases, the Lender has consented to the use of its Cash Collateral for the day-to-day operations of the Debtors' business.

9.   Various mechanics liens have also been recorded against the Hotel Properties. Although the validity, amount and priority of the liens have yet to be established, they are alleged to be in the approximate aggregate amount of $22,970,821.13.  *See* Debtors' Trial Exhibit 40, introduced into evidence for the trial conducted on August 23 and 24, 2010.

10.   The Lender has filed an objection to the professional fee application recently filed in these cases to the extent the Debtors seek to use the Lender's Cash Collateral to satisfy

---

Development and Construction Management Agreement dated as of November 1, 2007 executed by Gateway Deck; (x) that certain Assignment and Subordination of Management Agreements dated as of November 1, 2007 executed by Gateway Hotel; and (xi) that certain Assignment and Subordination of Management Agreements dated as of November 1, 2007 executed by Gateway Deck, (collectively, the "Additional Collateral Documents").

their professionals' fees and expenses (the "Lender Fee Application Objection") [Dkt. No. 345].

In the Lender Fee Application Objection, the Lender asserts that Lender's interest in the

Collateral is not adequately protected and as a consequence, its Cash Collateral cannot be

utilized to satisfy such professionals' fees and expenses without the Lender's consent.   The

Lender and Debtors are currently engaged in discovery and a trial on the Lender Fee Application

Objection is scheduled for December 13 and 14, 2010.

11.    On June 4, 2010, the Debtors filed a joint chapter 11 plan [Dkt. No. 205] (the

"Plan") and a Motion for an Order (A) Approving Procedures for the Sale of Substantially All of

the Debtors' Assets; (B) Scheduling an Auction; (C) Approving Assumption and Assignment

Procedures; (D) Approving Form of Notice; and (E) Granting Related Relief [Dkt. No. 206] (the

"Bid Procedures Motion"), which contemplated the sale of substantially all the Hotel Properties

to a stalking horse bidder (the "Stalking Horse") for $47.5 million, free and clear of liens, far

below the amount of the Lenders' $130 million claim as of the Petition Date.

12.    On June 22, 2010, the Debtors filed a proposed form of Hotel Asset Purchase

and Sale Agreement between the Debtors and the Stalking Horse [Dkt. No. 223].  On August 20,

2010, the Debtors filed an amended Asset Purchase Agreement [Dkt. No. 283] (as amended, the

"Asset Purchase Agreement") and a First Amended Plan [Dkt. No. 286] (as amended, the

"Plan").[2]  The filed version of the Asset Purchase Agreement is not executed by either party.

13.    On July 8, 2010, the Lender filed an objection to the Bid Procedures Motion

[Dkt. No. 235] (the "Bid Procedures Objection").   In addition to opposing the Debtors' attempt

to deny the Lender right to credit bid, the Bid Procedures Objection identifies the Plan's

---

[2] On August 20, 2010, Debtors filed a Disclosure Statement [Dkt. No. 287] (the "Disclosure Statement").

many infirmities when juxtaposed against the requirements of section 1129 of the Bankruptcy Code.

14.     On July 19, 2010, Lender filed a Motion to Terminate Exclusivity or, Alternatively, Preclude any Further Extension of Exclusivity [Dkt. No. 244].

15.     At a hearing held on July 22, 2010, this Court expressly declined to follow the Third Circuit's ruling in *Phila. Newspapers, LLC v. Official Comm. Of Unsecured Creditors* (*In re Phila. Newspapers, LLC)*, 599 F.3d 298 (3d Cir. 2010), thereby precluding the Debtors' ability to cramdown the Plan over the Lender's dissent under section 1129(b)(2)(A)(iii) of the Bankruptcy Code.   The Court then scheduled an evidentiary hearing for the purpose of determining whether there exists "cause" to deny credit bidding under section 363(k) of the Bankruptcy Code.

16.     The evidentiary hearing was conducted on August 23rd and 24th 2010.   At a status hearing conducted on August 30, 2010, the Court, on the record of the hearing, advised that based on the record of the evidentiary hearing it found no cause to preclude the Lender from credit bidding under section 363(k) of the Bankruptcy Code and denied the Bid Procedures Motion.

17.     On August 30, 2010, the Court entered an Order terminating the Debtors' plan exclusivity [Dkt. No. 319].

18.     On October 5, 2010, the Court entered an order [Dkt. No. 336] denying the Bid Procedures Motion wherein the Court set forth its decision that the Debtors may not use section 1129(b)(2)(A)(iii) of the Bankruptcy Code to circumvent the Lender's right to credit bid (the "Bid Procedures Denial Order").   In addition, based on the record before it, the Court found that the Debtors did not demonstrate cause to deny credit bidding under Bankruptcy Code sections

1129(b)(2)(A)(ii) and 363(k). *See In re River Road Hotel Partners*, Order Denying Debtors' Bid

Procedures Motion, Case No. 09-30029, Bankr. N.D. Ill., p. 4 [Dkt. No. 462].

19.    The Debtors have appealed the Bid Procedures Denial Order (the "Appeal') and

specifically, the Court's ruling as a matter of law, that the Debtors' cannot, in the context of a

plan sale, preclude credit bidding under 1129(b)(2) of the Bankruptcy Code.

20.    The Seventh Circuit has yet to take any action on the Appeal following entry of

the RadLAX Certification on November 4, 2010.  Significantly, in granting the Debtors' motion

to certify, this Court remarked, "Notwithstanding the Debtors' reference to alternative

resolutions, the huge difference between the value of the real estate and the amounts owed the

lenders, the proposed sale precluding credit bidding appears to this bankruptcy judge to be the

only realistic hope the debtors have to confirm a plan in chapter 11." *See* River Road

Certification, at p. 3, ¶8.

### RELIEF REQUESTED AND THE REASONS THEREFOR

21.    The Lender requests entry an order pursuant to section 362(d) of the Bankruptcy

Code terminating the automatic stay extant under section 362(a) to permit the Lender to exercise

its rights and remedies against the Collateral under applicable law.

22.    Section 362(d) of the Bankruptcy Code provides in pertinent part as follows:

> … the court *shall* grant relief from the stay provided under
> subsection (a) of this section, such as terminating, annulling,
> modifying or conditioning such stay-
>
> (1) for cause, including the lack of adequate protection of an
>     interest in property of such party in interest;
> (2) with respect to a stay of an act against property under
>     subsection (a) of this section, if –
>
>> (A) the debtor does not have an equity in such property;
>>     and
>> (B) such property is not necessary to an effective
>>     reorganization;

11 U.S.C. § 362(d) (emphasis added).

23.     Subsections (d)(1) and (d)(2) are disjunctive and mandatory.  If movant prevails

under either section 362(d)(1) or 362(d)(2) the Court *must* grant relief from the automatic stay.

*In re Opelika Mfg. Corp.*, 66 B.R. 444, 447 (Bankr. N.D. Ill. 1986) ("A bankruptcy court may

modify the § 362(a) stay for either or both of the above reasons ....")

24.     The Debtors have the burden of proof on all stay relief issues save whether the

Debtors have any equity in the Collateral (an issue on which as the Stalking Horse bid under the

Plan reflects, there can be no real dispute).   Specifically, Bankruptcy Code section 362(g)

provides:

> In any hearing under subsection (d) or (e) of this section
> concerning relief from the stay of any act under subsection (a) of
> this section –
>
> (1) the party requesting such relief has the burden of proof on the
> issue of the debtor's equity in the property; and
> (2) the party opposing such relief has the burden of proof on all
> other issues.

11 U.S.C. § 362(g).

A.     **Under Section 362(d)(2) of the Bankruptcy Code, this Court is Required to Grant Relief from the Automatic Stay.**

(i)     The Debtors Have No Equity in the Collateral

25.     Equity has been defined as "the amount or value of a property above the *total*

liens or charges".  *Stewart v. Gurley*, 745 F.2d 1194, 1196 (9th Cir. 1984) (emphasis in original)

(citations omitted).  As of the Petition Date, the Lender's claim exceeded $130,000,000.[3]  The

Debtors acknowledge the amount and validity of the Lender's claim.  (*See e.g.,* Disclosure

---

[3] Given this Court's rulings on the trial on the Debtors' wrongful-conduct theory of "cause" to deny the Lender the right to credit bid, there can be little doubt that the Debtors lack any grounds for maintaining counterclaims against the Lender.

Statement at p. 15).  Nor is there any dispute that the Lender holds valid and perfected liens in all of the Hotel Properties.

26.    The record made by the Debtors in these cases establishes that they have no equity in the Collateral.  In the Bid Procedures Motion, the Debtors state that after marketing the Debtors' assets since November 2009, the highest and best offer received for the properties was the $47,500,000 offer from the Stalking Horse.  In the Disclosure Statement, the Debtors' estimate the proposed dividend to be paid to the Lender on account of its secured claim at approximately 20%.  *See* Disclosure Statement at p. 11.  In the Debtors' omnibus reply to the objections to the Bid Procedures Motion, the Debtors' stated "they do not believe any such bids will approach anywhere near the amount of the Lenders' claim.  Because the Lenders' claims far exceed the value of the Asset... ."  Dkt. No. 246 at pp. 19-20.

27.    The Debtors have not attempted to place any other values on the Hotel Properties.  In their schedules, they scheduled the value of the Hotel Properties as "unknown."  *See* Schedule A, Gateway Hotel [Dkt. No. 58] p.1; Schedule A, Gateway Deck [Dkt. No. 61] p.1.  And although early in the cases the Debtors obtained the Court's approval to retain an appraiser (*see* Dkt. No. 42), they have offered no opinion on value from the appraiser, and have declined to share any information received from that appraiser as to the value of the Hotel Properties.

28.    This Court too recognizes that the Lender is vastly undersecured.  In its recent order certifying the Appeal in the companion chapter 11 cases of River Road Hotel Partners LLC, this Court remarked on the "huge difference between the value of the real estate and the amounts owed the lenders . . . ," commenting that "[a]lthough the debtor has not provided an estimated value of the property the proposed stalking horse bid was a mere $42,000,000" whereas the principal secured lender, Amalgamated Bank is owed in excess of $161,000,000."

*See* River Road Certification at p. 3, fn 5. For administrative convenience, this Court did not make identical findings in its order certifying the Appeal in the instant cases, but states in the order that it is certifying the Appeal for the reasons stated in the River Road order. *See* RadLAX Certification at p. 2. Given the analogous facts in both cases – that is, a Stalking Horse bid of approximately $47 million against a claim of in excess of $130 million – this Court would similarly characterize the Lender's unsecured position as a "huge difference."

29.     The Lender recently commissioned an appraisal of the Hotel Properties. As of May 10, 2010, the appraised value of the Hotel was $67.8 million and the Gateway Deck $31.5 million, for a total of $99.3 million, or approximately $30 million less than the Lender's claim. In addition, several parties have asserted mechanics liens against the Hotel Properties. According to the Debtors, such alleged liens aggregate approximately $22,900,000.00.

30.     Thus, there is no dispute that the Lender has satisfied its burden under section 362(g)(1).

     (ii)     <u>The Collateral is Not Necessary for a Successful Reorganization</u>

31.     To prevent stay relief, the Debtors bear the burden of establishing that the Hotel Properties are necessary for an effective reorganization. 11 U.S.C. §§ 362(d)(2)(B) and (g); *In re Boomgarden*, 780 F.2d 657, 663 (7th Cir 1985). After enjoying the protection of the automatic stay for fifteen months, the Debtors' only and last chance of effecting a plan is dependent on the reversal of Bid Procedures Denial Order. Even assuming that the Debtors were to achieve their hope for reversal of the Bid Procedures Denial Order, they cannot meet the burden imposed on them by the Bankruptcy Code.

32.     To meet the burden imposed on the Debtors, they must demonstrate that the Hotel Properties are essential for an effective reorganization *that is in prospect*. This means

there must be a "reasonable possibility of an effective reorganization within a reasonable time."

*United Savs. Ass'n of Tex. V. Timbers of Inwood Forest Assocs. Ltd.*, 484 U.S. 365, 375-76

(1988) (quoting *United Savs. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.* (*In re*

*Timbers of Inwood Forest Assocs., Ltd.*)*,* 808 F.2d 363, 370-371 (5th Cir. 1988)) (emphasis in

original), *Aff'd , United Savs. Ass'n of Tex., 484 U.S. 365*; *see also Edgewater Walk Apartments*

*v. MONY Life Ins. Co. of Am.*, 162 B.R. 490, 495 (N.D. Ill. 1993); *Am. State Bank v. Grand*

*Sports, Inc. (In re Grand Sports, Inc.)*, 86 B.R. 971, 975 (Bankr. N.D. Ind. 1988).

      33.     Mere speculation of a successful reorganization is not enough; the Debtors must

provide concrete, objective facts that a successful reorganization is in prospect and that such a

plan is feasible. *See, e.g.,* Danny Thomas Props. II Ltd. P'ship v. Beal Bank, S.S.B (*In re Danny*

*Thomas Props. II Ltd. P'ship)*, 241 F.3d 959 (8th Cir. 2001) (holding that a chapter 11 plan was

not feasible because the debtor's projections were mere speculation, and the debtor's post-

petition financials indicated that it would operate at a loss throughout the life of the plan).   As

the *Grand Sports* bankruptcy court opined:

> [T]he 'effective reorganization' standard must be given meaning . . .'
> *In re Timbers*, 808 F.2d at 371. Thus, 'the debtor must do more than
> evince high hopes.' *In re Timbers*, 808 F.2d at 371. A 'mere financial
> pipe dream' is insufficient to meet the requirements of § 362(d)(2).' *In*
> *re Jug End in the Berkshires*, 46 B.R 892, 902 (Bankr. D. Mass. 1985.
> *See also In re 6200 Ridge, Inc.*, 69 B.R. 837, 843 (Bankr. E.D. Pa.
> 1984). In the same fashion, sincerity, honesty, willingness, and
> visionary promises will not support a conclusion that there is reasonable
> possibility of a successful reorganization. *In re Foss*, 76 B.R 719, 725
> (Bankr. D.N.D. 1987) (discussing the reasonable likelihood of
> rehabilitation pursuant to 11 U.S.C. § 1112(b)(1) (citing *In re Clarkson*,
> 767 F.2d 417, 420 (8th Cir. 1985). Instead, '[t]he automatic stay will
> remain operative . . . only if the debtor can demonstrate that its prospects
> of an effective reorganization are well founded . . .' *In re Playa Dev.*
> *Corp.*, 68 B.R. 549, 555 (Bankr. W.D. Tex. 1986). Consequently, a
> debtor must do more than merely assert that it can reorganize if only
> given the opportunity to do so. These assertions must have some

foundation 'based upon objective fact.' *In re Foss*, 76 B.R. 719, 725
(Bankr. D.N.D. 1987).

*Grand Sports*, 86 B.R. at 975.

(a)    *There is No Possibility for a Reorganization within a Reasonable Time*

34.    In assessing what constitutes a "reasonable time" to effect a plan within the
context of a motion for stay relief under section 362(d)(2), bankruptcy courts examine the
totality of the circumstances and focus on several relevant factors.  Such factors include, for
example: the length of time the debtor has been in possession and operating its business; the
length of time since the expiration of exclusivity; and the presence or absence of good faith
efforts by the parties to negotiate a consensual solution to the case. *Edgewater,* 162 B.R. at 499-
500 (citing *In re Ashgrove Apartments of DeKalb County, Ltd.*, 121 B.R. 752, 756 (Bankr. S.D.
Ohio 1990)).

35.    The duration of the pendency of the case is a critical factor.  In the early phase
of a chapter 11 case, the court may be inclined to grant the debtor the benefit of the doubt,
particularly where the debtor continues to enjoy exclusivity.  However, the threshold the debtor
must satisfy to defeat a motion for relief from the stay increases with the duration of the case.
*Ashgrove*, 121 B.R. at 757-67 (debtor is granted greater latitude in the early stages but must
necessarily be more precise later on); *see also, e.g., Sumitomo Trust & Banking Co., Los Angeles
Agency v. Holly's Inc. (In re Holly's Inc.)*, 140 B.R. 643, 701-03 (Bankr. W.D. Mich 1992)
(threshold showing of a plausible plan in the early days of the case versus threshold showing of
assured feasibility after expiration of the exclusivity period); *Edgewater*, 162 B.R. at 500-01
("Debtor would have been required to demonstrate that one of its plans would *surely succeed*
under the standard imposed by *In re Holly*") (emphasis in original).

36.     Under any objective set of criteria, the Debtors have no prospect of confirming their Plan within a reasonable time.    Assuming a scenario in a light most favorable to the Debtors, it is entirely plausible that the Debtors would not be in a position to confirm their Plan, if at all, for at least another year and quite possibly longer.

37.     The cases have been pending for approximately fifteen (15) months. Exclusivity was terminated almost three months ago.  The Debtors have not submitted a new or revised plan and are not seeking approval of any disclosure statement in contemplation of advancing the plan approval process.  Furthermore, although the parties have spoken during the course of the cases, they are not close to an agreement.  This is no surprise given the Debtors' assessment of what is a credible path is already reflected in the Plan.   And despite their representation to this Court that they would be considering alternative reorganization scenarios, the Debtors so far have offered no such proposals to this Court or the Lender.  *See* Transcript of Hearing held August 30, 2010, filed in River Road Case No. 09-30029 [Dkt. No. 439 Ex. 2], p. 6 (counsel to the Debtors stated that "the debtor is going to be exploring an internal reorganization in each case at this point.").

38.     The Debtors' prospects of confirming their Plan, one which this Court has ruled cannot be confirmed because of its attempt to prevent the Lender from credit bidding, rests solely with a hope for reversal of the Bid Procedures Denial Order.   Indeed, it is likely that the certification process and the Appeal could take close to a year (and potentially longer) before the Appeal is fully adjudicated.

39.     Even if they prevail on Appeal, the Debtors face enormous legal obstacles to confirming their Plan (or any other plan embedded in the current architecture of the Plan, or indeed, as the Court has essentially noted in granting the motion certifying the appeal, any plan

that the Lender opposes.)  However, assuming the Debtors clear the many legal hurdles which stand in their way of effecting their Plan, the plan confirmation process itself would nonetheless take several months.

40.     Initially, the Debtors will need to resurrect their agreement with the Stalking Horse.  From the outset, the Lender has questioned the veracity of the Asset Purchase Agreement which neither party has executed, and to date, the Debtors have yet to address this issue.  Most recently, the Lender in its objection to the Debtors' motion to certify the Appeal, observed that the Stalking Horse has the unqualified right to terminate the Asset Purchase Agreement based on the Debtors' inability to meet any of the so called "Bankruptcy Contingencies" *See* Lender's Objection to Debtors' Motion for Certification [Dkt No. 358] at ¶¶ 1, 24**.**  In response, the best the Debtors can offer is that the Stalking Horse remains interested in pursuing the transaction. *See* Debtors' Reply in Support of Their Motion for Certification [Dkt. No. 361] at p.7.  In any event, from the outset, the Debtors will need to reach an agreement with the Stalking Horse (or another prospective stalking horse).

41.     Thereafter, the Debtors would seek approval of bid procedures, and presumably, procedures similar if not identical to, those for which approval was sought in the Bid Procedures Motion.  The Lender has raised several grounds for contesting the Debtors' proposed sale to the Stalking Horse.  As set forth in the Bid Procedures Objection, the Lender is justifiably concerned that the process which gave rise to the Stalking Horse bid and agreement was not fair and open, and questions whether the Debtors have fulfilled their fiduciary duties to their estates and creditors.  Indeed the proposed transaction is suspect and subject to strict scrutiny on account of the favorable treatment afforded the Debtors' insiders under the Asset Purchase Agreement.  As

a result, the Lender would take discovery on these and other issues in connection with the Debtors' effort to obtain approval of bid and auction procedures.

42.     Assuming the Debtors obtained approval of bid procedures under which the Lender would be precluded from credit bidding, the Debtors would then need to seek approval of a disclosure statement, and conduct a successful solicitation.  Lastly, the Debtors will be faced with the daunting task of confirming a Plan over the many substantive objections interposed by the Lender, including among others that the Debtors cannot furnish the Lenders' with the "indubitable equivalent" of their claims under section 1129(b)(2)(A)(iii).  Under the most ambitious of schedules, these processes and contested matters will take many months.

43.     Assuming the Debtors are able to overcome all of the material legal challenges which confront them, namely, the Appeal followed by a contested auction, disclosure statement and Plan confirmation processes, the Debtors' confirmation timeline, is at best a year, and easily longer.  Thus, under the most favorable of circumstances these cases would have been pending for approximately two and half years before the Debtors would conceivably be in a position to implement their Plan.  Under any standard, such a time frame cannot be considered "reasonable" within the purview of section 362(d)(2)(B).

(b)     *There is No Reasonable Possibility for an Effective Reorganization*

44.     "To be 'effective' a plan must be confirmable." *Edgewater*, 162 B.R. at 498. 'To be confirmable, specific requirements must be met. *See* 11 U.S.C.  § 1129"; *Id.*  As a result, this Court "must weigh the evidence presented against the standards imposed by section 1129 to determine whether the threshold requirements of section 1129 can be met." *Id.*  "The debtor must, at a minimum, provide some kind of map which charts a path through chapter 11 to a

successful reorganization." *Grand Sports, Inc.*, 86 B.R. at 975.   Under the circumstances, the

Debtors are unable to provide such a roadmap.

45.    The Plan as proposed is not confirmable because it impermissibly seeks to

cramdown the Lender under 1129(b)(2)(A)(iii). *See* Order Denying Debtor' Bid Procedures

Motion [Dkt. No. 336] referring to Order Denying Debtors' Bid Procedures Motion entered in

*River Road Hotel Partners*, Case No. 09-30029 [Dkt. No. 462].   Thus, the Debtors cannot meet

their burden of demonstrating the existence of an effective Plan.   To even have a remote chance

of doing so, the Debtors would have to demonstrate to this Court that there is near certainty that

they will prevail on Appeal, a showing they absolutely cannot make.

46.    The Lender, most notably in the Bid Procedures Objection, has previously

identified several of the Plan's infirmities, in addition to the Plan's preclusion of credit bidding.

Notably, assuming the Debtors prevail on Appeal, the Lender submits that the Debtors would be

unable to satisfy the "indubitable equivalent" requirement under section 1129(b)(2)(A)(iii) – an

issue which remains one of the significant questions never answered in *Philadelphia

Newspapers*.[4]  Given that the Debtors' Plan is predicated on satisfying this requirement, the

Debtors cannot satisfy their burden of demonstrating a reasonable prospect of confirming their

Plan.   Indeed, it is a very uncertain prospect.

47.    Another of the Plan's serious shortcomings is its reliance on the Lender's Cash

Collateral to satisfy virtually all of the distributions to be made to holders of priority and

administrative claims.   The Plan offers no basis for this impermissible surcharge of the Lender's

Collateral.

---

[4]    The instant cases, like *Philadelphia News* are distinguishable from *Pacific Lumber*, which concerned the appeal
of a confirmation order and wherein the bankruptcy court had, in connection with confirmation, considered
extensive evidence on valuation including the testimony of eight experts. *Bank of New York Trust Co., N.A. v.
Official Unsecured Creditors' Comm. (In re Pacific Lumber Co.)*, 584 F.3d 229, 248-49 (5th Cir. 2009).

48.     Moreover, the Lender questions the Debtors' good faith in proposing the Plan. *See* 11 U.S.C. § 1129(a)(3). The Debtors propose to sell the Hotel Properties free and clear of all liens (including the Lender's liens) while failing to identify any genuine benefit to their estates and creditors that this forced sale will create. The proposed sale and the insider Stalking Horse bid that are the gist of the Plan seem to be designed to advance the interests of only two parties -- the Stalking Horse and its insider allies -- while offering no benefits to the Lender or the Debtors' other creditor constituents

49.     As the Debtors apparently recognize, they have absolutely no prospect of confirming a stand alone reorganization plan. Any such plan could not meet the feasibility standards imposed by the Bankruptcy Code. *See* 11 U.S.C. § 1129(a)(11). During the fifteen-month period during which the Debtors have languished in chapter 11, they have built up only $2.4 million in Cash Collateral as a result of their operations. While the Debtors promote this modest cash build-up as a sign of their success, it is in fact compelling evidence that the Debtors are unable to successfully reorganize on a stand-alone basis. In fact, the postpetition cash position of the Debtors would be drastically negative (*i.e.*, a negative cash position of approximately $9 million) if they had been merely paying contractual interest to their Lender only on its secured claim, let alone if they had not been relieved of other prepetition obligations.

50.     The bankruptcy court in *Grand Sports* granted relief from the stay to the lender because the debtor failed to satisfy the "feasibility" standard under section 362(d)(2) of the Bankruptcy Code. *Grand Sports*, 86 B.R. 971. The debtor's testimony concerning its ability to successfully reorganize consisted of hopes and predictions that future sales would significantly increase and unsupported assurances that costs would correspondingly decrease. *Id.* The court noted that such testimony does not represent the quality or quantity of evidence necessary for a

debtor to meet its burden of proof. *Id.* The bankruptcy court, after hypothesizing a reorganization plan, ultimately determined that, even if the debtor could adequately protect the lender and keep its business operations afloat, the money available to the Debtor would be inadequate to fund a confirmable plan (*i.e.*, the cash generated will be unable to service the debt). *Id.*

51. This Court has recognized that "the proposed sale excluding credit bidding appears to be the only realistic hope the Debtors have to confirm a chapter 11 plan." *See* River Road Certification at p. 3 ¶8. While the Plan indeed represents the Debtors' only hope, the Debtors cannot satisfy their burden that they have a realistic prospect of confirming their hoped-for Plan within a reasonable time. The Debtors similarly cannot carry the burden of proving that the Collateral is necessary to an effective reorganization within the meaning of section 362(d)(2)(B). Given the absence of any equity in the Collateral, both prongs of section 362(d)(2) are satisfied, and relief from the automatic stay is mandatory.

**B.   Relief from the Automatic Stay is Mandated Under Section 362(D)(1) of the Bankruptcy Code for "Cause"**

(i)   Standard to Determine if "Cause" Exists to Lift the Automatic Stay

52. The Bankruptcy Code cites "lack of adequate protection of an interest in property" as one of the non-exclusive "for cause" bases for granting relief from the automatic stay under section 362(d)(1) of the Bankruptcy Code. 11 U.S.C. § 362(d)(1).

53. The burden of proof on a motion to lift the automatic stay for cause under section 362(d)(1) is a shifting one. Section 362(d)(1) requires an initial showing of cause by the movant, while section 362(g) places the burden of proof on the debtor for all issues other than "the debtor's equity in property," 11 U.S.C. § 362(g); *Sonnax Indus., Inc. v. Tri Component Products Corp. (In re Sonnax Indus., Inc.)*, 907 F.2d 1280, 1285 (2d Cir. 1990); *see also*

*Boomgarden*, 780 F.2d at 663 (the debtor has the ultimate burden of proving that the creditor's security interest is adequately protected). Thus, where movant has made the initial showing of cause, "the burden shifts to the debtor to prove that adequate protection exists for any significant diminution in the value of the collateral." *Fed.l Nat'l Mortg. Ass'n v. Dacon Bolingbrook Assocs. Ltd. P'ship (In re Fed. Nat'l Mortg. Ass'n)*, 153 B.R. 204, 208 (N.D. Ill. 1993).

> (ii)   The Lenders' Interest in the Collateral is Not Adequately Protected

54.    To determine whether a secured creditor's interest is adequately protected for purposes of section 362(d)(1), courts first look to the property's "equity cushion" – the value of the property after deducting the claim of the creditor seeking relief from the automatic stay and any senior liens. *See Nantucket Investors II v. Cal. Fed. Bank (In re Indian Palms Assocs. Ltd.)*, 61 F.3d 197, 207 (3d Cir. 1995) (citations omitted).

55.    In the absence of a sufficient equity cushion, the creditor's interest in its collateral will not be *adequately protected* if the value of the collateral is depreciating during the term of the stay. *Timbers*, 484 U.S. at 370. Thus, if the collateral has been declining in value, the movant is entitled to cash payments or additional security to compensate for the decline. *Id.* If the debtor is unable to furnish other means of adequate protection, the stay must be lifted. *See Boomgarden*, 780 F.2d at 663; *see also In re Addison Props. Ltd. P'ship*, 185 B.R. 766, 770 (Bankr N.D. Ill. 1995).

> (iii)   The Debtors Cannot Show Adequate Protection

56.    Under the case law most commonly employed in this District, the Lender is adequately protected *only if* the total value of the Lender's Collateral as of the Petition Date has not declined to date and will not decline in the future.[5] *Addison Props. Ltd.*, 185 B.R. at 769-70,

---

[5] The Lender has filed the Lender Fee Application Objection, and the Lender's position in support of that objection applies in all respects to this Motion.

784-85 [6]  It is the Debtors' burden of proof to show that the Lender will be adequately protected. *Id.* at 767-68; *see also, e.g., In re Energy Partners, Ltd.*, 409 B.R. 211, 235-36 (Bankr. S.D. Tex. 2009); *In re EES Lambert Assocs.*, 62 B.R. 328, 343 (Bankr. N.D. Ill. 1986); *see also, Addison Props.* at 769 ("Where a creditor is threatened with a decline in the value of its collateral, the Bankruptcy Code provides that the estate must protect the creditor's interest, either by periodic payments or substitute liens covering the decline, or by some other means that provides the 'indubitable equivalent' of the creditor's interest in the estate's property.")

57.     In the context of Debtors' request to use the Lender's Cash Collateral to pay their professional fees, the Debtors purport to carry their burden of proof that the Lender is adequately protected by asserting that the value of the Lender's Collateral neither has declined nor is at risk of declining (Third Perkins Coie Fee Application [Dkt. No. 334], pp. 17-19, ¶¶ 49-55). To support this contention, the Debtors' sole "evidence" are their claims that the "Hotel has done well throughout these difficult economic times and has increased in value since the Petition Date", that the estate's "cash on hand" has increased from $388,292.42 to $4,195,794.64 and that cash on hand "is expected to increase in the coming months." *Id.*, at p. 18, ¶ 53.

58.     For the first proposition – that the Hotel Properties' values have not decreased since the Petition Date – the Debtors provide *no* direct evidence whatsoever. Their only evidence is their unsupported claim that the Hotel Property's performance has improved postpetition and that the Debtors' cash on hand has increased during the same period.

59.     As their Schedules A filed in both cases (and failure to amend them) demonstrate, the Debtors did not even *know* what the value of the properties were on the Petition Date. Evidently, they still do not know their value. As noted above, although the Debtors

---

[6] As the Lender has noted on a previous occasion, it disagrees with the dual valuation method of *Addison Properties* (*see* Dkt. No. 207, ¶ 16, n. 2), but it assumes the Court will follow that decision. Hence, while reserving its rights on that issue, it will not address it further on this occasion.

obtained the Court's approval to retain an appraiser (*see* Dkt. No. 42), they have not offered any appraisal on value from the approved firm. How, then, can they make any claim about what has happened to the values since the Petition Date? The meaninglessness of saying, in effect, "We do not know what the value was on the Petition Date and we don't what it is now, but we know it has gone up," is patent.

60.    Even more telling is the fact that the Debtors propose to show that the Hotel Properties have increased in value only a few months after they proposed a plan of liquidation based upon a "stalking horse" bid for the Hotel Properties and related assets in the total amount of just $47.5 million for assets that were acquired and built for construction costs aggregating approximately $140 million just two years ago.

61.    The same can be said about the Debtors' claim that their cash on hand will only increase in the coming season: that is nothing more than an unsupported *prediction*. That cash on hand has, in fact, increased appears to be true. But the significance of that is equivocal and creates more questions than answers. For example, how much is due to the fact that the Debtors did not make certain payments on prepetition debt after they filed their cases? In addition to general unsecured claims that may have been caught in the petition cycle, there are payments to contractors that the Debtors have not had to make that are now reflected in mechanics' liens. Similarly, there are recurring payments that the Debtors have not had to make since filing the cases such as payments on ongoing construction work that may have been halted and, of course, payments to the Lender. As an indication of what the latter alone would mean in terms of what the Debtors have saved up in these cases, at $1.5 million a month for the approximately 15 months of these cases, the interest of $21 million would have more than swallowed up the cash the Debtors have accumulated. To put it differently, the Debtors would not be doing so well if

they had been paying the Lender, let alone if they had not been relieved of other prepetition obligations.

62.     The value of a property is not a function alone of whether it has a positive cash flow (not to mention an artificially-positive cash flow because the Debtors have not paid a cent of debt service – or even adequate protection payments – to the Lender since the Petition Date), or even an improving cash flow.  Valuation involves capitalization of cash flows using rates that take into account risks and alternative investments.  Given the original approximately $142 million amount of the loans, the property values at issue are in the eight or nine figure range. Even a small adverse change in an investor's capitalization rate would swamp that cash flow figure.  In other words, positive cash flow does not mean that overall value is not declining. Indeed, investors may be more bearish on hotels generally, on hotels in this market or on this Hotel in particular, and therefore will want higher returns than they did on the Petition Date. Such investors would pay less now than they would have on the Petition Date.  That the Debtors have increased their cash on hand in the safe harbor of bankruptcy does not mean, therefore, that the value of the Hotel Properties has not declined.  Rather, no conclusion at all about value can be drawn from the Debtors' cash position.

63.     Finally, even if the cash trend during some portion of the cases is positive, the question under *Addison Properties* is not whether things may be getting better, but what the overall change in value has been since these cases were filed a year and a quarter ago.  As noted, the Debtors have to date presented no direct evidence of the value of the Hotel Property on the Petition Date or the current value.

64.     By contrast, the Lender's appraisal information, which it will offer at the hearing on this Motion, indicates that the value of the Hotel Properties (including the Parking

Deck) in mid-2009, just months before the cases were filed, was $117.8 million, and it was only about $99.3 million a year later, about five months ago.

65.     Accordingly, under the test imposed by *Addison Properties*, the Lender's interest in the Collateral is not adequately protected.  Given the decline in value, the Debtors have no ability to furnish the Lender with adequate protection and relief from the stay under section 362(d)(1) is mandatory.  By the Debtors' own admission, the Hotel Properties are not generating sufficient so called "excess cash" to offset the decline in the value of the properties. *See e.g., Addison Properties* at 770 ("In the absence of such "adequate protection", a creditor threatened with a decline in the value of its interest in the estate's property is entitled to relief from the automatic stay to pursue its remedies against property in which it has an interest.") (citations omitted).

## NOTICE

66.     Notice of this Motion has been given to: (a) the Office of the United States Trustee; (b) counsel to the Debtors; and (c) all parties who have filed appearances or requested notices through the Court's CM/ECF system.  In light of the nature of the relief requested, the Lender submits no further notice is needed.

## CONCLUSION

WHEREFORE, the Lender respectfully requests that this Court enter an order (A) terminating the automatic stay in effect in the Debtors' bankruptcy cases pursuant to section 362(d) of the Bankruptcy Code and Bankruptcy Rule 4001 to permit Lender to enforce its rights as a secured creditor under applicable law with respect to the Collateral; and (B) granting such other relief as is necessary or appropriate.

Dated: November 12, 2010
Chicago, Illinois

**AMALGAMATED BANK**, as Trustee of
Longview Ultra Construction Loan Investment
Fund, f/k/a Longview Ultra I Construction Loan
Investment Fund, in its capacity as administrative
agent for itself and U.S. Bank National Association,
in its own right and as the contractual and legal
successor-in-interest with respect to certain loans
formerly owned by San Diego National Bank


By: /s/ *Mary E. Olson*
        One of its Attorneys

John W. Costello (Atty. No. 522406)
Mary E. Olson (Atty. No. 6297334)
Wildman, Harrold, Allen & Dixon LLP
225 West Wacker Drive, Suite 2800
Chicago, Illinois 60606-1229
Tel: (312) 201-2000
Fax: (312) 201-2555
E-mail: costello@wildman.com
          molson@wildman.com

-and-

Adam A. Lewis
Morrison & Foerster LLP
425 Market Street
San Francisco, California 94105-2482
Tel: (415) 268-7000
Fax: (415) 268-7522
E-mail: alewis@mofo.com

Norman S. Rosenbaum
John A. Pintarelli
Morrison & Foerster LLP
1290 Avenue of the Americas
New York, NY 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Email: nrosenbaum@mofo.com
          jpintarelli@mofo.com

ny-946350

## RADLAX GATEWAY HOTEL, LLC SERVICE LIST

|  | Fax No./Email Address | Method of Delivery |
|---|---|---|
| RadLAX Gateway Hotel, LLC<br>1110 Jorie Blvd., Suite 350<br>Oak Brook, Illinois 60523<br>Attention: Peter Dumon |  | U.S. Mail |
| RadLAX Gateway Deck, LLC<br>1110 Jorie Blvd., Suite 350<br>Oak Brook, Illinois 60523<br>Attention: Peter Dumon |  | U.S. Mail |
| RadLAX Gateway Hotel, LLC<br>c/o David M. Neff<br>Brian A. Audette<br>Perkins Coie LLP<br>131 S. Dearborn, Suite 1700<br>Chicago, IL  60603 | 312-251-5865<br>baudette@perkinscoie.com<br>dneff@perkinscoie.com | USBC ECF notification<br><br>Hand Delivery |
| Steve Wolfe<br>Office of the U.S. Trustee<br>219 S Dearborn St., Room 873<br>Chicago, IL 60604 | steve.g.wolfe@usdoj.gov | USBC ECF notification<br><br>U.S. Mail |
| San Diego National Bank<br>c/o Forrest B. Lammiman<br>Meltzer, Purtill & Stelle, LLC<br>300 S. Wacker Dr., Suite 3500<br>Chicago, IL 60606 | 312-987-9854 | USBC ECF notification |
| Gary Redcher Plumbing Company dba<br>George Kaufman Plumbing<br>c/o Steven L. Bergh<br>Prenovost, Normandin & Dawe<br>2122 N. Broadway, Suite 200<br>Santa Ana, CA 92706 | 714-835-2889 | U.S. Mail |

|  | Fax No./Email Address | Method of Delivery |
|---|---|---|
| EREF Mezzanine Fund, LLC<br>c/o William J. Choslovsky<br>Neal, Gerber & Eisenberg LLP<br>2 N. LaSalle Street, Suite 2200<br>Chicago, IL 60602 | 312.269.1747<br>wchoslovsky@ngelaw.com | USBC ECF notification |
| Bomel Construction Co. Inc.<br>c/o Benjamin R. Trachtman<br>Trachtman & Trachtman<br>27401 Los Altos, Suite 300<br>Misión Viejo, CA 92691 | 949.282.0111<br>btrachtman@trachtmanlaw.com | U.S. Mail |
| Bomel Construction Co. Inc.<br>c/o Lauren Newman<br>Thompson Coburn LLP<br>55 E. Monroe Street, 37th Fl.<br>Chicago, IL 60603 | 312.782.3659<br>lnewman@tcfhlaw.com | USBC ECF notification |
| Raymond-Southern California Inc.<br>f/k/a Raymond Interior Systems<br>c/o John J. O'Leary<br>20 S. Clark St., Suite 500<br>Chicago, IL 60603 | 312.372.7076<br>joleary@olearylawfirm.com | USBC ECF notification |
| Carlson Hotels Worldwide<br>Attn: Legal Dept. - MS8256<br>701 Carlson Parkway<br>Hopkins, MN 55305 | 763.212.1080 | U.S. Mail |
| Radiant Services<br>651 W. Knox Street<br>Gardena, CA 90248 | 310.323.4030 | U.S. Mail |
| R.W. Smith & Co.<br>8555 Miralani Drive<br>San Diego, CA 92126 | 858.530.0224 | U.S. Mail |
| R.W. Smith & Co.<br>18511 Broadwick Street<br>Rancho Dominguez, CA 90220 |  | U.S. Mail |

|  | Fax No./Email Address | Method of Delivery |
|---|---|---|
| PSAV Presentation Services<br>1700 E. Golf Rd., Suite 400<br>Schaumburg, IL 60173 | 847.222.1614 | U.S. Mail |
| M3, Inc.<br>c/o Anthony A. DiMonte<br>Law Offices of Virgil L. Roth<br>625 Fair Oaks Ave., Suite 255<br>South Pasadena, CA 91030 | 626.441.1166 | U.S. Mail |
| VOA Associates<br>224 S. Michigan, Suite 1400<br>Chicago, IL 60604 | 312.554.1412 | U.S. Mail |
| Destination Shuttle Services<br>8939 S. Sepulveda Blvd.<br>Suite110-1031<br>Los Angeles, CA 90045 | 310.338.9498 | U.S. Mail |
| Los Angeles Dept of Water & Power<br>Attn: Legal Dept.<br>111 North Hope Street<br>Los Angeles, CA 90012 | 213.367.1455 | U.S. Mail |
| Excel Elevator Service<br>4444 Union Pacific Ave.<br>Los Angeles, CA 90023 | 323.268.3216 | U.S. Mail |
| Quality Parking Service<br>16101 Ventura Blvd., Suite 315<br>Encino, CA 91436 | 818.382.6690 | U.S. Mail |
| Pacific Coast Steel<br>Gerald P. Kennedy<br>c/o Procopio Cory Hargreaves &<br>   Savitch LLP<br>530 "B" Street, Suite 2100<br>San Diego, CA 92101 | 619.235.0398<br>gpk@procopio.com | U.S. Mail |

|  | Fax No./Email Address | Method of Delivery |
|---|---|---|
| C.A. O'Reilly & Associates Builders<br>c/o Steven W. Weinshenk<br>Timothy W. Hamilton<br>Steven W. Weinshenk, P.C.<br>24005 Venture Boulevard<br>Calabasas, CA 91302 | swlawfirm@swlawfirm.net<br>timothy.l.hamilton@gmail.com<br>818.591.4108 | U.S. Mail |
| C.A. O'Reilly & Associates Builders, Inc.<br>c/o Jonathan P. Friedland<br>Levenfeld Pearlstein, LLC<br>2 N. LaSalle St., Suite 1300<br>Chicago, IL 60602 | 312.346.8434<br>jfriedland@oplegal.com | USBC ECF notification |
| LAX Enterprise, LP<br>c/o Mathew E, McClintock<br>Harley J. Goldstein<br>K&L Gates, LLP<br>70 W. Madison St., Suite 3100<br>Chicago, Illinois 60602 | 312-345-9979 | USBC ECF notification |
| Western States Fire Protection Company<br>c/o L. Judson Todhunter<br>Howard & Howard Attorneys PLLC<br>200 S. Michigan Avenue<br>Chicago, IL  60604 | 312-372-5617<br>JTodhunter@howardandhoward.com | USBC ECF notification |
| Frank S. Smith, Masonry, Inc.<br>c/o Derek L. Wright<br>Foley & Lardner LLP<br>321 N. Clark St., Suite 2800<br>Chicago, IL 60654 | dlwright@foley.com | USBC ECF notification |
| Cattrac Construction, Inc.<br>Stephanie Jacinto, President<br>15030 Slover Avenue<br>Fontana, CA 92337 | 909.355.4833 | U.S. Mail |
| Board of Equalization<br>3321 Power Inn Rd.<br>Sacramento, CA 95826 | 916.227.6746 | U.S. Mail |

| | Fax No./Email Address | Method of Delivery |
|---|---|---|
| Edward Don & Company and<br>c/o Dennis E. Quaid<br>Thompson Coburn LLP<br>55 E. Monroe Street, 37th Fl.<br>Chicago, IL 60603 | 312.782.1315<br>dquaid@tcfhlaw.com | USBC ECF notification |
| US FoodService<br>15155 Northam Street<br>La Mirada, CA 90638 | 714.670.3779 | U.S. Mail |
| Hufcor Airwalls<br>8739 Artesia Blvd.<br>Bellflower, CA 90706 | 562.630.8203 | U.S. Mail |
| Tidy Building Services<br>609 W. William David Pkwy.<br>Suite 202<br>Metairie, LA 70005 | 504.833.6585 | U.S. Mail |
| M3, Inc.<br>1414 Fair Oaks Ave., Suite 3<br>South Pasadena, CA 91030 | 626.441.0355 | U.S. Mail |
| Fehr & Peers Transportation Consulting<br>100 Pringle Ave., Suite 600<br>Walnut Creek, CA 94596 | 925.933.8007 | U.S. Mail |
| K&M Foodservice<br>2443 East 27th Street<br>Vernon, CA 90058 | 323.582.7401 | U.S. Mail |
| Lato Supply<br>3828 W. Whitton Ave.<br>Phoenix, AZ 85019 | 602.269.5892 | U.S. Mail |
| Mark Kitchen Equipment Services<br>824 East Hellman Ave<br>Monterey Park, CA 91755 | 602.269.5892 | U.S. Mail |
| West Central Produce<br>2020 E. 7th Place<br>Los Angeles, CA 90021 | 213.629.3700 | U.S. Mail |

|  | Fax No./Email Address | Method of Delivery |
|---|---|---|
| Los Angeles World Airports (LAWA)<br>Office of City Attorney<br>1 World Way. Room 104<br>Sacramento, CA 90045-5803 | 310.646.1893 | U.S. Mail |
| Pacific Coast Steel<br>c/o Rebecca D. Rosenthal<br>Howard L. Adelman<br>Adelman & Gettleman Ltd.<br>53 W. Jackson Blvd., Suite 1050<br>Chicago, IL 60604 | (312) 435-1059<br>rrosenthal@ag-ltd.com<br>hadelman@ag-ltd.com | USBC ECF notification |
| Catalina Pacific Concrete<br>c/o Monica C. O''Brien<br>Gregory K. Stern, P.C.<br>53 W. Jackson Blvd., Suite 1442<br>Chicago, IL 60604 | Phone: 312.427.1558<br>Gstern1@flash.net | USBC ECF notification |
| Stress Express Inc.<br>c/o John V. Delgaudio, Jr.<br>John V. Delgaudio, Jr., Ltd.<br>4620 N. Racine Ave., Suite 9<br>Chicago, IL 60640 | 312.528.9499<br>jvd@jvdlaw.com | USBC ECF notification |
| Apollo Electric, Inc.<br>c/o David T. Ward<br>Hallstrom Klein & Ward<br>15615 Alton Pkwy., Suite 175<br>Irvine, CA 92618 | 949.450.1588<br>David@HKWLLP.com | U.S. Mail |
| Audio Visual Group, Inc.<br>c/o Matthew J. Botica<br>Myja K. Kjaer<br>Winston & Strawn LLP<br>35 W. Wacker Drive<br>Chicago, IL 60601 | Phone: 312-558-5600<br>Fax: 312-558-57<br>mkjaer@winston.com | USBC ECF notification |
| Federal Deposit Insurance Corp.<br>c/o Nathan Coco<br>McDermott Will & Emery LLP<br>227 W. Monroe Street<br>Chicago, IL 60606 | 312-984-7700 | USBC ECF notification |

|  | **Fax No./Email Address** | **Method of Delivery** |
|---|---|---|
| Federal Deposit Insurance Corp. c/o Geoffrey T. Raicht McDermott Will & Emery LLP 227 W. Monroe Street Chicago, IL 60606 | 212-547-5444 | U.S. Mail |