2

**Exhibit B (Part 1)**

# CONSTRUCTION LOAN AGREEMENT

AMALGAMATED BANK, as Trustee
of Longview Ultra Construction Loan Investment Fund ("**Agent**"), in its capacity as
administrative agent for itself and SAN DIEGO NATIONAL BANK, a national banking
association

(collectively, the "**Lender**")

RADLAX GATEWAY DECK, LLC, a Delaware limited liability company,

and

RADLAX GATEWAY HOTEL, LLC, a Delaware limited liability company,

(together, the "**Borrower**")

Location:    Northeast Corner of Century Blvd. and Sepulveda Blvd., Los Angeles, CA
a/k/a 6225 W. Century Blvd.

CONSTRUCTION LOAN AGREEMENT

THIS CONSTRUCTION LOAN AGREEMENT (this "**Agreement**") is made and entered into as of the ____ day of November, 2007, by and between AMALGAMATED BANK, a bank organized under the laws of the State of New York, as Trustee of the Longview Ultra Construction Loan Investment Fund, a collective trust fund organized under the laws of the State of New York, having an address at 1825 K Street, NW, Washington, DC 2006 ("**Agent**"), in its capacity as administrative agent for itself and SAN DIEGO NATIONAL BANK, a national banking association (collectively, the "**Lender**"), and RADLAX GATEWAY DECK, LLC, a Delaware limited liability company, and RADLAX GATEWAY HOTEL, LLC, a Delaware limited liability company (hereinafter collectively referred to as "**Borrower**"), and each having an address at 1110 Jorie Blvd., Suite 350, Oak Brook, Illinois 60523.

W I T N E S S E T H:

MAJOR TERMS

The following is a description of the major terms of this Agreement and related Security Documents (as defined below) and are incorporated into and made a part of this Agreement. In the event of a conflict between the provisions of this section, and the provisions of any of the Articles, Paragraphs or Subparagraphs of this Agreement, the provisions of such Articles, Paragraphs or Subparagraphs shall govern and control. This section shall in no way alter, modify, define, or be used in construing, the text of any such Articles, Paragraphs or Subparagraphs.

A. Property and Improvements: Approximately 7.3625 acres of real estate located at the northeast corner of Century Boulevard and Sepulveda Boulevard, Los Angeles California, upon which Borrower shall (i) renovate an existing twelve (12) story, approximately 401,363 square foot Radisson hotel containing approximately 580 guest rooms, and (ii) construct a new seven (7) level parking garage with not less than 2,239 parking spaces, together with all finish work with related facilities and amenities described in the Plans.

B. Amount of Loan: The lesser of seventy-five percent (75%) of the appraised value of the Land and Improvements upon completion or One Hundred Forty Two Million Dollars ($142,000,000.00). The loan will be evidenced by a joint and several liability promissory note executed, jointly and severally, by RadLAX Gateway Deck, LLC and RadLAX Gateway Hotel, LLC.

C. Note Interest Rate: The Note will bear an annual interest rate of the Prime Rate plus one percent (1%) as published daily in The Wall Street Journal with an initial minimum rate of nine and one-quarter percent (9 1/4%) *per annum*. The Note will have an interest rate cap of 2% *per annum* over the stated loan rate at the time of closing. An Interest Rate Cap Fee in the amount of one quarter-percent (1/4%) of the total Loan commitment amount shall be paid by Borrower at

Closing from the first draw on the Loan. Interest on the outstanding principal balance of the loan shall be paid on a monthly basis from the net operating income of the Radisson Hotel. An interest reserve will be established by the Lender to make such payments to cover any shortfall in the event the net operating income of the Radisson Hotel is not sufficient to make such monthly payment interest payments.

Upon the Sale and Closing of the Parking Deck, as described herein, the interest rate will be reduced to the Prime Rate as published in <u>The Wall Street Journal</u> plus one-half percent (1/2%) effective the date Lender receives the net proceeds thereof as a repayment of principal. The reduced interest rate will fluctuate immediately, with the Prime Rate; provided following such reduction, the minimum loan rate will be eight and three-quarter percent (8 ¾%).

D.     Term of Loan:  Thirty six (36) months.

E.     Term Extensions:  Four (4) term extensions of six (6) months each.
Fees for Term Extensions: one-half percent (1/2%) of the then outstanding principal balance of the Loan for each six (6) month extension period amount, payable in advance, as provided in the Note.

F.     Commitment Fees: The Borrower shall pay a one percent (1%) commitment fee based on the amount of the Note. The commitment fee will be paid at closing from the first draw on the Loan.

G.     Default Rate: 5% over the applicable Note Interest Rate.

H.     Contractor/Subcontractor Requirements:

Guaranteed Maximum Price (Lump Sum) General Contract (Parking Deck)
Contractors Union Affiliated

Guaranteed Maximum Price (Lump Sum) General Contract (Hotel)
Contractors Union Affiliated

I.     Retainage/Contingency:

Ten percent (10%) for hard and soft costs specified in the General Contract until the construction of the Improvements, as determined by the Independent Inspecting Engineer, is fifty percent (50%) complete.

J.     Equity Contribution Requirement:  Fifteen Million Dollars ($15,000,000.00), which must be either (i) deposited with Agent prior to the Closing Date, and disbursed prior to the Closing Date; (ii) used to acquire the Land or pay other direct costs approved by the Agent for the construction of the Improvements (with evidence of such payment delivered to the Agent prior to the Closing Date); or (iii) increases in the value of the Land approved by the Agent; provided, however,

|    |    |
|----|----|
|    | the Agent may require additional Equity Contributions or Completion Deposits from the Borrower during the term of the Loan to meet any construction budget shortfalls if the Loan is not In Balance that are revealed or occur during the construction of the Improvements. |
| K. | Guarantors: RadLAX Gateway Project Management, LLC, a Delaware limited liability company, RadLAX Bossy Holdings, LLC, an Illinois limited liability company, and RadLAX Dumon Holdings, LLC, an Illinois limited liability company. |
| L. | Borrower's Fed. ID:<br><br>RadLAX Gateway Deck, LLC:     26-1276227<br><br>RadLAX Gateway LAX Hotel, LLC: 26-1168377 |
| M. | Use of Loan Proceeds: The Loan Proceeds are to be used solely for the purpose of acquiring the Land, constructing the Improvements (as hereinafter defined), in accordance with the approved Project Budget/Disbursement Schedule, and to pay other related expenses and costs in connection therewith as approved by Lender. |
| N. | Expense Deposit and Loan Administration Fee: Borrower has deposited One Hundred Thousand Dollars ($100,000.00) with Agent to be applied to Lender's due diligence, legal and other expenses and shall pay to Agent a Loan Administration Fee in the amount of Two Thousand Dollars ($2,000.00) per month. |
| O. | Prepayment: The Loan may be prepaid after eighteen (18) months from the Closing Date upon 60 days prior written notice (which may be given prior to the expiration of said eighteen (18) month period) without penalty; except in the event of Lender's receipt of full or partial repayment arising from an insured casualty, condemnation or from the net proceeds from the Sale of the Parking Deck described herein, or from the proceeds from any "release price" as described in Section 6.9 (iv), which may occur at any time during the term of the Loan and in which event there is no prepayment penalty. Prepayment prior to the commencement of the nineteenth (19th) month after the Closing Date shall be subject to a penalty of one percent (1%) of the Loan Commitment amount, except for those circumstances stated in the immediately preceding sentence. Notwithstanding the foregoing, if Net Operating Income for a particular month is in excess of such amount necessary to satisfy such monthly payment of Interest due to Lender, such excess amount may be used to prepay a portion of the Loan without penalty with the consent of Agent, which consent shall not be unreasonably withheld. |
| P. | Parking Deck Sale: Borrower shall pay Agent (as a partial or full repayment of the Loan) one hundred percent (100%) of the net proceeds from the sale of the Parking Deck; provided, however, in the event the net proceeds from the sale of |

3

258000-6

the Parking Deck (which shall mean the sale price less broker fees and reasonable closing costs as approved by Lender) are equal or in excess of Seventy-Five Million and 00/100 Dollars ($75,000,000.00), then the Borrower shall pay Agent ninety-seven (97%) of the net proceeds from the sale of the Parking Deck.

## ARTICLE 1

## DEFINITIONS

1.1   Definitions.  As used in this Agreement, the following terms shall have the meanings indicated:

(a)   **Advance or Disbursement**: A disbursement of the Loan Proceeds to Borrower under the terms of this Agreement.

(b)   **Assignment of Leases and Rents**: The Assignment of Leases and Rents executed by Borrower in favor of Agent dated the date hereof.

(c)   **Borrower's Architect**:  Walker Parking Consultants/Engineers, Inc., a Michigan corporation, which is a subcontractor of the General Contractor.

(d)   **Closing or Closing Date**: The date upon which Borrower satisfies all conditions contained in Paragraph 6.3 (a) and the initial Disbursement of the Loan is made.

(e)   **Commencement Date**: Together, (i) the date construction of the Hotel Improvements commences, but no later than one hundred eighty (180) days after the Closing Date, subject to *Force Majeure*; and (ii) the date construction of the Deck Improvements commences, but no later than June 30, 2008, subject to *Force Majeure*.

(f)   **Completion Date**: The date of Completion of Improvements, but in no event later than   (i) as required pursuant to the PIP with respect to the Hotel Improvements, subject to *Force Majeure*, and (ii) two (2) years after the Commencement Date with respect to the Deck Improvements, subject to *Force Majeure*.

(g)   **Completion Deposit**: An amount (if any) calculated by Agent to equal the difference between (i) the amount which Agent from time to time determines to be necessary to pay all costs to be incurred in connection with the completion of the development of the Improvements and the construction, marketing, ownership, management, maintenance, and operation of the Improvements in accordance with this Agreement prior to the repayment of the Indebtedness; to pay all sums which may accrue under the Security Documents prior to repayment of the Indebtedness, including, without limiting the generality of the foregoing, interest on the Indebtedness; and to enable Borrower to perform and satisfy all of the covenants of Borrower contained in the Security Documents and (ii) the Loan Proceeds then unadvanced by Lender to Borrower under the terms and conditions of this Agreement. For purposes hereof, the Loan shall be deemed to be "In Balance" if the Equity Contribution and any Completion Deposit,

together with the Loan Proceeds, equal the funds required for the completion, marketing, ownership, management, leasing and sale of the Improvements in accordance with the Plans and the Budget/Disbursement Schedule attached hereto as Exhibit "B" and any change orders approved by Borrower or required to complete the construction of the Improvements in accordance with the Plans.

(h) **Completion of Improvements**: Completion of the Improvements (including, where the context requires, some or all tenant finish work) in accordance with the Plans and the "Project Budget", a copy of which is attached hereto as Exhibit "B" (the "**Project Budget**") and incorporated herein by this reference, free of any mechanic's, materialmen's or any similar lien and in compliance with all necessary Legal Requirements, as evidenced, to the satisfaction of Agent, by: (i) with respect to the Deck Improvements, certificates from applicable Governmental Authorities authorizing occupancy and use of the Improvements, including all necessary certificates of occupancy (or their equivalent); (ii) with respect to the Deck Improvements, a certificate from the Borrower's Architect and from the Independent Inspecting Engineer (whichever is required by Agent in Agent's sole discretion) that the Improvements have been completed in substantial accordance and compliance with the Plans and the Legal Requirements; (iii) Title Insurance insuring Agent for the full amount of the Indebtedness, containing all endorsements required by Agent and affirmative insurance against mechanic's and materialmen's liens and deleting any exception relating to completion of the Improvements and other exceptions specified by Agent which may be deleted pursuant to applicable regulations; and (iv) an affidavit and full release of liens in recordable form from the Contractors (or such bonds and title insurance over such liens as are acceptable to Agent) and, upon request of Agent, any other contractors or subcontractors who have performed work on, or furnished materials for the Improvements.

(i) **Contracts**: Any and all contracts and agreements, written or oral, between Borrower and any Contractor, all such contracts being subject to prior approval of Agent, between any of the foregoing and any subcontractor and between any of the foregoing and any other person or entity relating in any way to the construction of the Improvements, including the performing of labor or the furnishing of standard or specially fabricated materials in connection therewith; provided, Agent's approval shall be deemed given if Agent fails to notify Borrower that Agent's approval is being withheld within five (5) business days after the Agent has received (i) Borrower's request for approval, and (ii) all other information reasonably necessary for Agent to adequately evaluate such request. The term "Major Contract" shall mean any contract or series of contracts having a value in excess of One Hundred Thousand and 00/100 Dollars ($100,000.00).

(j) **Contractor**: Contractors retained by Borrower to provide grading and excavation, concrete, paving, masonry, steel-roofdeck, roof and gravel, carpentry, drywall, plumbing, electrical, sprinkler and fire compliance, painting, landscaping and other major trades and approved by Agent to construct the Improvements or any part thereof; provided, Agent's approval of any proposed Contractor shall be deemed given if Agent fails to notify Borrower that Agent's approval is being withheld within five (5)

5

258000-6

business days after the Agent has received (i) Borrower's request for approval, and (ii) all other information reasonably necessary for Agent to adequately evaluate such request. The term "Contractor" shall also include the General Contractor. The term "Major Contractor" shall mean any Contractor with a contract or series of contracts having a value in excess of One Hundred Thousand and 00/100 Dollars ($100,000.00).

(k) **Environmental Indemnification Agreement:** The Environmental Indemnification Agreement dated the date hereof executed by Borrower and each Guarantor in favor of Agent.

(l) **Equity Contribution:** The amount of equity capital actually invested by Borrower, as determined by Agent in its reasonable discretion, which must be either (i) deposited with Agent prior to the Closing Date, and disbursed prior to the Closing Date; (ii) used to acquire the Land or pay other direct costs approved by the Agent for the construction of the Improvements (with evidence of such payment delivered to the Agent prior to the Closing Date); or (iii) increases in the value of the Land approved by the Agent; provided, however, the Agent may require additional Equity Contributions or Completion Deposits from the Borrower during the term of the Loan to meet any construction budget shortfalls if the Loan is not In Balance that are revealed or occur during the construction of the Improvements.

(m) **Event of Default:** Any happening or occurrence described in Article 7.

(n) **Force Majeure:** Any event or events or occurrences or series of occurrences which are beyond the control of Borrower to prevent or control such as earthquakes, floods, acts of God, natural emergencies, terrorism, sabotage or warlike acts by third parties, material shortage, labor disputes or strikes, or legal or regulatory action that has the effect of delaying or haltering construction progress in all or any portion of the Project; provided, however, "Force Majeure" shall not include any labor disputes or strikes resulting from a violation by Borrower under any so-called "Project Labor Agreement" to which it is a party.

(o) **General Contractor:** Together, (i) Bomel Construction Co., Inc., a California corporation, with respect to the Deck Improvements; and (ii) a general contractor to be approved by Lender with respect to the Hotel Improvements.

(p) **General Contract(s):** Together, (i) a Standard Form of AIA Agreement(s) as modified between Borrower and Bomel Construction Co., Inc., a California corporation, as Design/Builder for the design and construction of the Deck Improvements (and certain demolition work), which shall provide for a guaranteed maximum (Lump Sum) fixed price; and (ii) a Standard Form of AIA Agreement(s) as modified between Borrower and a general contractor to be approved by Lender for the completion of the Hotel Improvements, each as approved by the Lender.

(q) **Governmental Authority:** Any and all courts, boards, agencies, commissions, offices or authorities of any nature whatsoever for any governmental unit (federal, state, county, district, municipal, city or otherwise) whether now or hereafter in

6

258000-6

existence and having jurisdiction over the Mortgaged Property and the Borrower and the Guarantors.

(r) **Guarantors**: Jointly and severally, RadLAX Gateway Project Management, LLC, a Delaware limited liability company, RadLAX Bossy Holdings, LLC, an Illinois limited liability company, and RadLAX Dumon Holdings, LLC, an Illinois limited liability company.

(s) **Guaranty**: That Completion Guaranty Agreement of even date herewith from Guarantors in favor of Agent (the "**Completion Guaranty Agreement**"), and that Payment Guaranty Agreement of even date herewith from the Guarantors in favor of Agent (the "**Payment Guaranty Agreement**").

(t) **Hotel Land**: All those certain tracts, pieces or parcels of land situated and lying in the County of Los Angeles, California more particularly described in Exhibit "A-1" attached hereto and by this reference made a part hereof, all Fixtures or other Improvements situated thereon and all rights, titles and interests appurtenant thereto.

(t) **Hotel Operator**: Portfolio LAX, LLC, an Illinois limited liability company.

(u) **Improvements**: The improvements described in the Plans, being generally described as (i) the renovation of an existing twelve (12) story, approximately 401,363 square foot Radisson hotel containing approximately 580 guest rooms, pursuant to the terms of the Property Improvement Program ("**PIP**") attached to the Franchise License Agreement (collectively, the "**Hotel Improvements**"), and (ii) the construction of a new seven (7) level parking deck with not less than 2,239 parking spaces, (collectively, the "**Deck Improvements**"), each with all finish work with related facilities and amenities described in the Plans

(v) **Indebtedness**: The principal amount of, interest on and all other amounts, payments and premiums due under, or evidenced by the Note or secured by the Security Instrument, the Guaranty and any and all other documents now or hereafter executed by Borrower, Guarantors or any other related party in connection with the loan (the "**Loan**") of even date herewith made by Lender to Borrower, as evidenced by this Agreement, including, but not limited to, prepayment charges or premiums, late charges, default interest and advances as provided herein to protect the security of the Loan.

(w) **Independent Inspecting Engineer or Inspecting Engineer**: The architect, engineer, agent, consultant or other inspector selected and retained by Agent, at Borrower's expense, to observe the construction of, and to inspect the Improvements on behalf of Agent and to perform such other services as Agent may request.

(x) **Interest Rate**: The rate of interest accruing on the Note as set forth in Paragraph C of the Major Terms and payable monthly during the term of the Loan.

(y) **Land**: Together, the Hotel Land and the Parking Deck Land.

258000-6

(z) **Leases**: Any and all leases, rental agreements, subleases, licenses, concessions or other agreements (written or oral, now or hereafter in effect) which grant a possessory interest in and to, or the right to use, all or any part of the Mortgaged Property, together with all security and other deposits made in connection therewith.

(aa) **Legal Requirements**: Any and all present and future judicial decisions, statutes, rulings, rules, regulations, Permits, certificates or ordinances of any Governmental Authority in any way applicable to Borrower, any Guarantor or the Mortgaged Property, including, without limiting the generality of the foregoing, the ownership, use, construction, occupancy, possession, operation, maintenance, alteration, repair or reconstruction thereof.

(bb) **Loan Proceeds**: The proceeds from the Loan disbursed to Borrower or applied by Agent under the terms hereunder in an aggregate amount equal to the lesser of seventy-five percent (75%) of the appraised value of the Land and Improvements upon completion or One Hundred Forty Two Million Dollars ($142,000,000.00).

(cc) **Mortgaged Property**: The Land, Improvements, and Leases, all other property (real, personal or mixed) which is conveyed by the Security Instruments or any other Security Document in which a security interest is therein created and all other property (real, personal or mixed) on which a lien or security interest is placed or granted to secure the repayment of the Indebtedness or the performance and discharge of the Obligations.

(dd) **Net Operating Income**:  As defined in that certain Management Agreement entered into by and between Borrower and Hotel Operator.

(ee) **Note**: The Note executed by Borrower and payable to the order of Amalgamated Bank, a bank organized under the laws of the State of New York in its capacity as administrator agent for San Diego National Bank, and as Trustee of the Longview Ultra Construction Loan Investment Fund, a collective trust fund organized under the laws of the State of New York, respectively, and any and all renewals, reinstatements, rearrangements, enlargements or extensions thereof or of any promissory note or notes given therefor.

(ff) **Obligations**: (i) Any and all of the covenants, warranties, representations and other obligations (other than to repay the Indebtedness) made or undertaken by Borrower, Guarantors or any other related party as set forth in the Security Documents and all other documents now or hereafter executed by Borrower, Guarantors or any related party in connection with the loan evidenced by the Note; (ii) any and all of the covenants, warranties, representations and other obligations made or undertaken by Borrower, Guarantors or any other related party as set forth in the Leases or Contracts, and any and all covenants, conditions and restrictions contained in any deed or other form of conveyance or in any other instrument of any nature that relate in any way or are applicable to the Mortgaged Property or the ownership, use or occupancy thereof (including, but not limited to, the Prescribed Laws); (iii) Borrower's or any Guarantors' presently or subsequently effective operating or limited liability company agreement or

other form of business association agreement; (iv) any and all Leases; (v) any and all terms, provisions and conditions of any Commitment which are to be performed or observed by Borrower; and (vi) any other contracts (written or oral) of any nature that relate, in any way, to the Mortgaged Property and to which Borrower or any Guarantor may be bound, including, without limiting the generality of the foregoing, any lease or other contract pursuant to which Borrower is granted a possessory interest in the Land.

(ff) **Parking Deck:** The new seven (7) level parking garage, with not less than 2,239 spaces, to be constructed by RadLAX Gateway Deck, LLC on the Parking Deck Land.

(gg) **Parking Deck Land**: All those certain tracts, pieces or parcels of land situated and lying in the County of Los Angeles, California more particularly described in Exhibit "A" attached hereto and by this reference made a part hereof, all Fixtures or other Improvements situated thereon and all rights, titles and interests appurtenant thereto, as the same may be modified pursuant to any future actions/proceedings relating to a so-called "lot-line adjustment" to be initiated by Borrower in conjunction with the sale of the Parking Deck with the consent of Agent. For purposes hereof, Agent shall be entitled to impose such reasonable terms and conditions to its consent, for example, and not by way of limitation, amendments to the Mortgage, survey, and Title Insurance.

(hh) **Permits:** Any and all governmental permits, approvals, inspections, orders, certificates and the like issued to or for the benefit of Borrower in connection with the development, construction, use and/or occupancy of the Mortgaged Property, specifically including, but not limited to, all building, excavation, sheeting, shoring, foundation, grading and occupancy permits.

(ii) **Plans:** Collectively, any and all Contracts, written or oral, between Borrower and General Contractor, together with the final plans and specifications, shop drawings and other technical descriptions prepared for the construction of the Deck Improvements and the Hotel Improvements, together with all amendments and modifications thereof.

(jj) **Prescribed Laws.** Collectively, (a) the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56) (The USA PATRIOT Act), (b) Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism, (c) the International Emergency Economic Power Act, 50 U.S.C. §§ 1701, et seq. and (d) all other Legal Requirements relating to money laundering or terrorism.

(kk) **Project**: Borrower's construction of the Improvements on the Land.

(ll) **Project Budget or Project Budget/Disbursement Schedule**: The project budgets prepared by Borrower, in form and substance satisfactory to Agent (as the same may be modified with the written consent of Agent), setting forth in detail by line item all

of the direct and indirect costs of construction of the Hotel Improvements and Deck Improvements, and any costs of owning, operating, leasing and maintaining the Mortgaged Property throughout the term of the Loan, and a complete project budget cash flow projection chart, attached hereto as **Exhibit "B-1"** and **Exhibit "B-2"**, each incorporated herein, and any and all amendments and/or revisions thereto.

(mm) **Security Documents**: This Agreement, the Note, the Deeds of Trust, the Guaranty, the Assignment of Leases and Rents, the Environmental Indemnification Agreement, the Assignment of Contracts Plans and Specifications and Permits, the Consent to Assignment of Contracts and any and all other documents now or hereafter executed by Borrower, Guarantors to evidence or secure the payment of the Indebtedness or the performance and discharge of the Obligations (sometimes also referred to collectively as the "**Loan Documents**").

(nn) **Security Instrument**: Together, (i) the Construction Loan Deed of Trust, Security Agreement and Assignment of Leases and Rents of even date herewith executed by RadLAX Gateway Deck, LLC encumbering the Parking Deck Land and the Improvements located thereon to Agent to secure the repayment of the Indebtedness and performance of the Obligations, and all amendments thereto; and (ii) the Construction Loan Deed of Trust, Security Agreement and Assignment of Leases and Rents of even date herewith executed by RadLAX Gateway Hotel, LLC encumbering the Hotel Land and the Improvements located thereon to Agent to secure the repayment of the Indebtedness and performance of the obligations, and all amendments thereto (together, sometimes herein also referred to as the "**Mortgage**").

(oo) **Title Company**: Chicago Title Insurance Company.

(pp) **Title Insurance**: A construction loan policy of title insurance all in form and substance satisfactory to Agent and containing no exceptions (printed or otherwise) which are unacceptable to Agent (the "Permitted Exceptions" shall be deemed acceptable), issued by a title company (or, if Agent so requires, by several title companies on a re-insured or co-insured basis, at Agent's option) acceptable to Agent, in its sole and absolute discretion, in the face amount of the Note and insuring that Agent has a first and prior security interest on the Mortgaged Property, containing all endorsements required by Agent in its sole and absolute discretion, subject only to the Permitted Encumbrances described in the Security Instrument.

(qq) **Unmatured Event of Default**: Any event, happening or occurrence which, with the giving of notice, the passage of time or both would constitute an Event of Default.

ARTICLE 2

BORROWER'S WARRANTIES AND REPRESENTATIONS

Borrower hereby unconditionally warrants and represents unto Lender and agrees as follows:

10

258000-6

2.1 *Information*. Except for those historical information, reports and papers (including, without limiting the generality of the foregoing, any and all balance sheets, statements of income or loss, reconciliation of surplus and financial data of any other kind) which are, to the best of Borrower's actual knowledge correct in all material respects, any and all information, reports, papers and other data (including, without limiting the generality of the foregoing, any and all balance sheets, statements of income or loss, reconciliation of surplus and financial data of any other kind) heretofore furnished, or to be furnished, to Agent by or on behalf of Borrower are, or when delivered will be, true and correct in all material respects; all financial statements of Borrower provided to Agent, including, but not limited to all balance sheets and statements of income or loss, have been, or when delivered will have been, prepared in accordance with generally accepted accounting principles consistently applied and fully and accurately present, or will present, the financial condition of the subjects thereof as of the dates thereof; and with respect to the financial data heretofore furnished, no materially adverse change has occurred in the financial condition reflected therein since the dates thereof.

2.2 *Litigation*. Except as may be otherwise set forth on any exhibit attached hereto, and except for matters which are covered by sufficient insurance, as of the date hereof there are no actions, suits or proceedings of a material nature pending or, to the knowledge of Borrower, threatened against or affecting Borrower, any Guarantor or the Mortgaged Property, or involving the validity or enforceability of the Security Instrument or the priority of the lien, security deed and security interest created therein; and no event has occurred (including specifically Borrower's and Guarantor's execution of the respective Security Documents and Borrower's consummation of the Loan represented thereby) which will violate, be in conflict with, result in the breach of or constitute (with due notice or lapse of time, or both) a default under any Legal Requirement or result in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever on the Mortgaged Property other than the liens and security interests created by or expressly permitted under the Security Documents. Notwithstanding anything contained herein to the contrary, in the event an action, suit or proceeding of a material nature is brought or threatened against Borrower, any Guarantor or the Mortgaged Property following the date hereof (collectively, a "Proceeding"), unless Borrower delivers evidence to the reasonable satisfaction of Agent that such Proceeding is (i) bonded or insured over by the Title Company; (ii) covered by insurance, or (iii) has no legal merit, Borrower shall cause such Proceeding to be dismissed, resolved or otherwise settled to the reasonable satisfaction of Agent within sixty (60) days from the date of the filing of such action, suit or proceeding, except that any action against Borrower described in Paragraph 7.3 shall be dismissed as provided therein.

2.3 *Compliance with Legal Requirements*. Borrower has (or prior to the commencement of construction of the Improvements will have, to the extent applicable to the Hotel Improvements and Deck Improvements, respectively) (i) received all requisite building permits and approvals of the Plans, (ii) filed and/or recorded all requisite plats and other instruments and (iii) in general, complied with all Legal Requirements required to be met prior to commencement of construction of the Improvements. If the present stage of construction of the Improvements does not require all such permits, then as construction progresses, Borrower shall promptly obtain such licenses before they become required. Borrower knows of no groups, organizations or people that are contesting the construction of the Improvements.

11

258000-6

    2.4    Streets, Easements, Utilities and Other Services. All streets, easements, utilities and related services necessary for the construction of the Improvements and the operation thereof for their intended purpose are available to the boundaries of the Land, including potable water, storm and sanitary sewer, gas, electric and telephone facilities and garbage removal.

    2.5    Contract and Commencement of Construction. Except for those items or matters listed on Schedule I, which Schedule specifies what types of contracts/activities have previously been entered into/done, neither Borrower, any Guarantor nor anyone else on Borrower's behalf has (i) commenced construction of the Improvements, (ii) purchased, contracted for or otherwise brought upon the Land any materials, specifically fabricated or otherwise, to be incorporated into the Improvements, (iii) entered into any Contracts or (iv) made any oral or written contract or arrangement of any kind, the performance of which by the other party hereto would or could give rise to a lien or claim on the Mortgaged Property, or any portion thereof; or if any such activities have taken place, Borrower shall cause Agent to be provided with affirmative title insurance coverage insuring against any claims or actions arising from such activities which could affect the lien or the priority of the lien of the Security Instrument.

    2.6    Validity of Security Documents. All action on Borrower's and each Guarantor's part requisite for the due authorization, creation, issuance, execution and delivery of the Security Documents has been duly and effectively taken, and each such document constitutes a legal and binding obligation of, and is valid and enforceable against, Borrower, Guarantors and the Mortgaged Property (as the case may be) in accordance with the terms thereof.

    2.7    Commitment. All of the representations, warranties, agreements and obligations made or undertaken by Borrower in the Commitment (as defined in the Mortgage), if any, will be true and correct in all material respects and (to the maximum extent that the same were to be complied with) have been complied with, as of the date hereof.

    2.8    Hazardous Substances. As used below, and in any of the other Security Documents, "**Hazardous Substances**" shall have the meaning as defined in Section 25281(f) of the California Health and Safety Code (including "waste" as defined in Section 13050(d) of the California Water Code), and shall include, without limitation, asbestos and raw materials which include hazardous constituents), or any other similar substances, or materials which are included under or regulated by any local, state or federal law, rule or regulation pertaining to environmental regulation, contamination or clean-up, including, without limitation, "CERCLA", as amended, or as may be amended from time to time, "RCRA", as amended, or as may be amended from time to time, or state lien or state superlien or environmental clean-up statutes, the U.S. Clean Water Act, or state and local equivalents of the foregoing, including, without limitation, the California Environmental Quality Act and the applicable provisions of the California Health and Safety Code, California Labor Code and the California Water Code (all such laws, rules and regulations being referred to collectively as "**Environmental Laws**"). Borrower warrants, represents and agrees that, except as disclosed in the environmental audit prepared for the Agent in connection with the Loan and the environmental reports described on Schedule II attached hereto (collectively, the "**Environmental Reports**"), as follows:

    (a)    Borrower has had performed reasonable investigations, studies and tests (constituting all appropriate inquiry) as to any environmental contamination, liabilities or

258000-6

problems with respect to the Mortgaged Property, including without limitation, the storage, disposal, presence, discharge or release of any Hazardous Substances at or with respect to the Mortgaged Property, and that such investigations, studies, and tests have disclosed no Hazardous Substances, underground storage tanks and/or their associated piping, or possible violations of any Environmental Laws.

(b) Neither the Mortgaged Property nor any other personal or real property owned by Borrower is subject to any private or governmental lien or judicial or administrative notice or action relating to Hazardous Substances or environmental problems, impairments or liabilities with respect to the Mortgaged Property or such other property, or the direct or indirect violation of any Environmental Laws.

(c) To the best of Borrower's knowledge, no Hazardous Substances are located on or have been stored, processed or disposed of on or released or discharged from (including ground water contamination) the Mortgaged Property and no above or underground storage tanks and/or their associated piping exist on the Mortgaged Property; except for such Hazardous Substances as may be necessary for the development and construction and operation of the Mortgaged Premises, (i) only in such quantities as shall be usual and customary, and (ii) that shall be handled only by appropriately trained (and licensed, if applicable) professionals and/or tradesmen; provided that the foregoing permitted Hazardous Substances shall not in any event be stored in bulk at the Mortgaged Property. Borrower shall not allow any Hazardous Substances to be stored, located, discharged, possessed, managed, processed or otherwise handled on the Mortgaged Property and shall comply with all Environmental Laws affecting the Mortgaged Property. Nothing herein shall be deemed to restrict or prevent the use of materials ordinarily associated with the construction and use of the Project, so long as such materials are used and stored (i) in reasonable amounts and (ii) in accordance with all Environmental Laws.

(d) Borrower shall immediately notify Agent should Borrower become aware of (i) any Hazardous Substance in violation of Environmental Law or other environmental problem or liability with respect to the Mortgaged Property, (ii) any "release" or threatened "release" (as defined in CERCLA and rules and regulations promulgated thereunder) of any Hazardous Substances on or from the Mortgaged Property or any other real property owned by Borrower, or (iii) any lien, action, or notice of the nature described in subparagraph (b) above. Borrower shall, at its own cost and expense, take all actions as shall be necessary or advisable for the clean-up of the Mortgaged Property, including all removal, containment and remedial actions in accordance with all applicable Environmental Laws (and in all events in a manner satisfactory to Agent and/or Agent's environmental advisor), and shall further pay or cause to be paid at no expense to Agent all clean-up, administrative, and enforcement costs of Government Authorities which may be asserted against the Mortgaged Property or the owner thereof. All costs, including, without limitations, those costs set forth above, damages, liabilities, losses, claims, expenses (including attorneys' fees and disbursements), fines and penalties, which are incurred by Agent, without requirement of waiting for the ultimate outcome of any litigation, claim or other proceeding, shall be

258000-6