UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

In Re:                                          )       Chapter 11
                                                )       Case No:  09 B 30047
RadLAX Gateway Hotel, LLC, et al.,              )
                                                )       Honorable Bruce W. Black
                    Debtors,                    )
_____ )

## MEMORANDUM DECISION

This matter is before the court for decision of LAX Enterprise, L.P.'s "Motion for Order

Granting and Requiring Immediate Payment of Administrative Expense Claim and Providing

Other Relief."  LAX Enterprise ("Enterprise") argues that it is entitled to an administrative

expense claim under section § 503(b) of the Bankruptcy Code[1] due to the Debtors' alleged

trespass on Enterprise's easement.  A hearing was held November 22 and 23 of 2010.  For the

following reasons, Enterprise's motion is denied.

## I.      Findings of Fact

The easement in question is situated in the block bounded by South Sepulveda Boulevard,

West Century Boulevard, Vicksburg Avenue, and West 98th Street, in Los Angeles, California.

The block is divided into three parcels of property: the office building commonly know as 9800

S. Sepulveda (the "Office Property"), the hotel commonly know as 6225 W. Century (the "Hotel

Property"), and the parking complex commonly know as 6200 W. 98th St. (the "Parking

Property").[2]

---

[1]      11 U.S.C. § 101 *ff*. Any reference to "section" or "the Code" is a reference to the Bankruptcy Code unless
another reference is stated.

[2]      The Los Angeles County Assessor's Identification Numbers for the three parcels are 4124-026-002, 4124-

On August 30, 1962, The Kratter Corporation ("Kratter") purchased the entire block from International Airport Hotel System, Inc. ("International"). Enterprise Ex. 19. At the time of the transfer, Airportel, Inc. ("Airportel") was leasing all the properties from International. *Id.* Kratter assumed the lease contemporaneously with the transfer and entered into an agreement with Airportel a day later to build a hotel on the Hotel Property. *Id.* Kratter then secured financing for the hotel construction. *Id.* In August of 1963, Kratter and Airportel agreed to amend the lease (the "1963 Lease and Easement") so that Kratter could also construct an office building on the Office Property. *Id.* Kratter also constructed a parking structure on the Parking Property to provide parking for the hotel and the proposed office building. *Id.*

Under the 1963 Lease and Easement, Airportel leased only the Parking Property and the Hotel Property from Kratter, and Kratter retained possession of the Office Property. To ensure that the office building had sufficient parking to satisfy the city zoning ordinances, Kratter reserved an easement in an area of the ground floor of the Parking Property to benefit the office building solely for parking purposes.[3]

To meet the requirements of the Los Angeles Municipal Code section 12.26 E.5, on January 30, 1964, Kratter also recorded an easement for the city's benefit.[4] It provided that the Parking Property would be burdened with 180 parking spaces for the benefit of the Office

---

026-005 and 4124-026-004 respectively.

[3]     The general rule is that a person cannot create an easement over his own land due to merger. The land, however, may be leased "subject to any privilege of easement which he may desire to retain*. " Butler v. Craft Eng Const. Co., Inc.*, 843 P.2d 1071, 1080 (Wash. App. 1992) citing Restatement of Property § 450. The property interests do not merge in such a scenario because an easement burdens the possessor of the land, not the owner. *See* Restatement of Property § 450, comments. Therefore, where the land is leased the owner may burden the possessor with an easement.

[4]     The recorded easement appears to state that it was recorded pursuant to section 12.26 D.5. There is no section 12.26 D.5. and section 12.26 E.5. was last amended on May 3, 1958. Therefore, either the section was moved to E.5. since 1958 or the document contains a typographical error.

Property (the "City Easement").[5]  Enterprise Ex. 15.  Without this easement, the city could not

give Kratter a building permit for the office building or a certificate of occupancy.  Los Angeles

Municipal Code § 12.26 E.5.

On June 25, 1964, Kratter executed a note for $10,000,000 in favor of Massachusetts

Mutual Life Insurance Company ("Mass Mutual").  Contemporaneously, Kratter executed a deed

of trust and parking agreement with Mass Mutual.  The deed of trust provided the Hotel Property

and the Parking Property as security for the note.  The parking agreement contained language

identical to that contained in the 1963 Lease and Easement, this time in favor of Mass Mutual as

beneficiary of the deed of trust (the "Mass Mutual Agreement").  Enterprise Ex. 16.  The Mass

Mutual Agreement did not and could not expand the easement rights under the 1963 Lease and

Easement because Airportel, the possessor of the property, was not a party to the agreement.  *Id.*

Within a month of executing the note to Mass Mutual, Kratter sold the Office Property to

a partnership named Los Angeles Property ("LAP") and recorded a document continuing the

easement created by the 1963 Lease and Easement and restated in Mass Mutual Agreement

burdening the Parking Property for the benefit of the office building.

For almost forty years the three properties operated in relative tranquility.  By 2002 LAX

Hospitality LP was the owner of the Hotel Property and the Parking Property.  It had an

agreement to lease the twenty parking spaces located on the Office Property for $3,500 per month

---

[5]      The California legislature provided for municipalities to require such easements to address the problem
caused when one property owner burdened one parcel of his property with parking to benefit another parcel.
Property law does not recognize the burden as an easement because a party cannot create an easement over his own
property.  Thus, when the owner sought to sell the burdened property to a separate owner the city was left with no
recourse to enforce the burden and effectuate its off-street parking requirements.  Government Code section 65870 *et
seq.* currently allows for such municipal ordinances.

to benefit the hotel.[6] Debtors' Ex. A; *see also* Enterprise Ex. 2(stating the "Total Number of

Parking Spaces = 20" on the Office Property). In 2003, Enterprise purchased the Office Property

from LAP and entered into a new lease agreement with the hotel's parking operator to lease the

spaces on the Office Property for use by the hotel for $5,000 per month.[7] Debtors Ex. B. Since

Enterprise purchased the Office Property the office building has been vacant. It is in a

dilapidated state and would require at least $4,000,000 in repairs before any space in the office

building could be occupied. Debtors Ex. H.

In 2007, two of the Debtors, RadLAX Gateway Hotel and RadLAX Gateway Deck,

purchased the Hotel Property and Parking Property, respectively. The Debtors

contemporaneously entered into a loan agreement with Amalgamated Bank[8] for $142,000,000.

Enterprise Ex. 29. The Debtors intended to use the proceeds from the loan to demolish the

existing parking structure and erect a larger structure in its place on the Parking Property. Once

the construction was complete, Gateway Deck was to sell the Parking Property for around

$85,000,000, leaving Gateway Hotel with a relatively low debt load that would be serviced

though operation of the hotel. Stipulated Facts ¶ 14.

Through 2008 the plan for a larger parking structure progressed. The Debtors and

Enterprise entered into a lease agreement whereby the Debtors leased the 20 parking spaces

---

[6]      Enterprise argues that the lease was for the 20 parking space located on the Office Property and for the
easement area. This assertion is not credible. The lease documents clearly state that the lease was only for the
parking space "located at 9800 S. Sepulveda Blvd., Los Angeles, California." Debtors Ex. A. The lease also
contains a merger clause that clearly states that the lease document constitutes the sole and only agreement and
"correctly sets forth the obligations of the Landlord and tenant." *Id.*

[7]      Enterprise again argues that this lease is for both the parking spaces on the Office Property and for use of
the easement area. The document again clearly states that only the Office Property parking was subject to the lease.
Debtors Ex. B.

[8]      Amalgamated Bank acting as Trustee of the Longview Ultra Construction Loan Investment Fund, in its
capacity as administrative agent for itself and San Diego National Bank, as the lender. Stipulation of Facts ¶ 11.

- 4 -

located on the Office property and the related easement area for $40,000 per month for a term of one year. Enterprise Ex. 22. The term could be extended for six additional months. *Id.* The Debtors believed that the additional parking spaces contiguous to the construction site would allow them to more freely park construction equipment and speed up the construction process. Day 2 Trial Tr. at p. 141, lines 16-25, p. 142, lines 1-25. In June and July of 2008 the Debtors and Enterprise discussed how the new parking structure would affect the parking easement. Debtors Ex. C. Enterprise made it clear that it did not want to interfere with the construction of the new parking structure but only wanted to protect its rights provided in the parking easement documents. *Id.* The Debtors assured Enterprise that its rights under the easement documents would remain the same after the new structure was completed. *Id.* The city issued a demolition permit on August 18, 2008, and the project commenced shortly thereafter.[9]

In March of 2009 Amalgamated terminated the Debtors' funding under the loan, which caused construction on the new parking structure to cease a month later. Day 2 Trial Tr. at p. 152 lines 12-15. Shortly thereafter, the parking lease agreement between Enterprise and the Debtors expired with no extension. Enterprise subsequently entered into an agreement to sell the Office Property to Acquest Development, LLC ("Acquest") for $13,500,000. Enterprise Ex. 4. The agreement expressly stated that "[Acquest] acknowledge[ed] the 180 parking spaces provided for

---

[9]      The city issued the permit on the mistaken belief that the Debtors owned the Office Property and that they would keep it vacant during the pendency of the construction. Therefore, there was no need to maintain the 180 parking spaces to service the office building. The Debtors and Enterprise disagree as to how the city came to believe that the Debtors were the owners of the Office Property. The Los Angeles Building Code only requires the owner of the property to assert under oath that the proposed work will not destroy or unreasonably interfere with the easement of another. It was made clear at the hearing that the Debtors believed that they were not destroying or unreasonably interfering with any easement in favor of the office building because the office building was vacant and uninhabitable in its current condition. Thus, because the permit could have been issued solely on the Debtors' assertion, the city's mistaken belief as to the owner of the Office Property is immaterial. Enterprise's consent simply was not required to obtain the permit. *See* Los Angeles Building Code § 91.106.4.3.4.

in the covenant and agreement regarding maintenance of off-street parking dated January 30, 1964, may not be available due to the construction/stalled construction of the adjacent parking structure." *Id.*

On August 17, 2009, the Debtors' filed a petition under chapter 11 of the Bankruptcy Code. To date the Debtors continue to operate the hotel. Construction on the parking structure has never resumed. Acquest later terminated its sales agreement with Enterprise on September 1, 2009. Stipulated Facts ¶ 44, 45.

## II.   Conclusions of Law

Enterprise asserts that it is entitled to an administrative expense under section 503(b)(1)(A) due to the Debtors' alleged trespass on Enterprise's exclusive easement. It alleges that the trespass has cost it millions of dollars in the form of a lost sale to Acquest and thousands more in the form of lost revenue from renting the easement area to a third party for parking purposes. Enterprise's motion fails for two reasons. First, it has failed to show under state law that a trespass occurred. Second, even if there were a trespass, it has failed to show that bankruptcy law provides a remedy.

## A.   Trespass

Put generally, a trespass is the unlawful interference with the right of exclusive possession of real property. 2 Cal. Torts § 17.29; 59 Cal. Jur. 3d Trespass to Realty § 5. Therefore, an owner of real property may be liable for trespass over his own land if he has transferred exclusive possession to another. 59 Cal. Jur. 3d Trespass to Realty § 1. Easements are very seldom the proper vehicle to transfer such exclusive possession. *See Pasadena v. California-Michigan Land & Water Co.*, 110 P.2d 983 (1941); Rest. 3d Property, Servitudes

- 6 -

(2000) § 1.2, com. d. The very idea of an easement that transfers a possessory interest is a

contradiction. An easement by definition creates "a non-possessory right to enter and use land in

the possession of another and obligates the possessor not to interfere with the uses authorized by

the easement." Rest. 3d Property, Servitudes § 1.2. Nevertheless, it appears that a possessory

interest easement may sometimes be created. *Pasadena*, 110 P.2d 983; Rest. 3d Property,

Servitudes (2000) § 1.2, com. d. Such exclusive easements, however, are extremely disfavored

by the law. 28A C.J.S. Easements § 221; *see also* 28 Cal. Jur. 3d Easements and Licenses § 53;

*Pasadena*,110 P.2d 983.

     To prove a possessory interest created by an exclusive easement, the claimant must show

a clear indication that the parties to the agreement intended such a transfer. *Gray v. McCormick*,

167 Cal. App. 4th 1019, 1025 (Cal. App. 4th Dist. 2009); *Pasadena*, 110 P.2d at 985; 28A C.J.S.

Easements § 221. Merely stating the easement is exclusive is not enough to make it possessory.

*See Gray* 167 Cal. App. 4th at 1027. Easements "are still considered nonpossessory interests if

the transferor is not excluded from the entire parcel and retains the right to make uses that would

not interfere with the easement." Rest. 3d Property, Servitudes § 1.2. com. d.; *see also*

*Blackmore v. Powell*, 150 Cal. App. 4th 1593, 1598 (Cal. App. 2d Dist. 2007). Thus, an

easement that provides that the owner of the property retains the right to continue to possess the

property, and enter upon it for some reason, does not create a possessory interest in favor of the

dominant tenement.

     This reading of the law is consistent with the cases cited by the parties. In *Gray v.*

*McCormick* the owner of the property granted an exclusive easement of access, ingress, and

egress in favor of the dominant estate. 167 Cal. App. 4th 1019. The easement document

provided a specific land area and repeatedly stated that it was exclusively for the dominant

estate's use. *Gray*, 167 Cal. App. 4th at 1026. The dominant estate was also burdened with all

of the maintenance and improvement costs associated with the easement area and was required to

indemnify the owners for any liability resulting from the dominant estate's exclusive use of the

property. *Id.* The court held that the easement documents were sufficient to vest exclusive

possession in the dominant tenement. *Id.*

Additionally, in *Blackmore v. Powell* the owners of the dominant estate constructed a

garage over an easement area that was created for "parking and garage purposes." 150 Cal. App.

4th at 1599. The court in that case agreed with the trial court that the dominant estate was given

exclusive use of the garage as a "necessary incident" of the easement. *Id.* And like *McCormick*,

maintenance of the garage solely burdened the dominant tenement. *Id.* The owner was

completely excluded from the property.

Here, there are two easements: the City Easement, between the City of Los Angeles and

the Debtors' predecessor-in-interest; and the 1963 Lease and Easement, between the Debtors'

and Enterprise's predecessors-in-interest. As to the City Easement, there is no clear indication in

the document that the easement was intended to be exclusive and possessory. It only intended

for the Debtors to provide 180 parking spaces for the benefit of the office building. It did not

define a space or require that the 180 parking spaces always be available even when the office

building was vacant.

The 1963 Lease and Easement expressly conveys to the Office Property the exclusive

right in the nature of an easement to park vehicles on a specified area on the Parking Property.

The owners of the Parking Property, however, reserved the right to use that area for ingress,

egress, and access purposes to service the non-easement area. The owners of the Parking

Property also retained the burden of nearly all maintenance of the easement area. The 1963

Lease and Easement also allowed the owners of the Parking Property to permanently obstruct

some of the easement area as long as a suitable replacement was found. In short, the easement

set out an area of parking stalls that the Office Property was allowed to use to park vehicles for

its benefit, but the owner of the Parking Property retained the right to enter onto the easement

area. Thus, there is no clear indication that the easement was intended to transfer exclusive

possession for the benefit of the Office Property and completely exclude the Debtors' from

possessing the property. Because the Debtors are not excluded from the easement area on the

Parking Property, they cannot be held liable under the theory of trespass.

**B.     Administrative Expense Under Section 503(b)(1)(A)**

Even if this easement did meet the requirements of an exclusive easement and the

Debtors were trespassing, Enterprise would still not have a viable administrative expense claim.

Under section 503(b)(1)(A) "actual, necessary costs and expenses of preserving the estate" are

given administrative priority. 11 U.S.C. § 503(b)(1)(A). There are two elements that must be

satisfied for an expense to be considered actual and necessary. 4 Collier on Bankruptcy ¶

503.06[3] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.). First, the claim must arise from

a transaction with the bankruptcy estate, and second, it must be to the estate's benefit. *Id.* The

estate's post-petition torts generally qualify as transactions with the bankruptcy estate. *J. Catton

Farms, Inc. v. First Nat'l Bank*, 779 F.2d 1242, 1249 (7th Cir. 1985); 4 Collier on Bankruptcy ¶

503.06[3]. Not all post-petition torts, however, can meet the "benefit to the estate" requirement.

4 Collier on Bankruptcy ¶ 503.06[3]. Only those torts that arise from the post-petition operation

of the estate's business are seen to benefit the estate. *See In re Jartran, Inc.,* 732 F.2d 584, 586

(7th Cir.1984); 4 Collier on Bankruptcy ¶ 503.06[3]. This is because it is often necessary for the

debtor in possession or trustee to continue to operate the business post-petition to preserve the

going concern value of estate. *See Reading Co. v. Brown*, 391 U.S. 471, 482 (1968); *In re*

*Jartran*, 732 F.2d at 586; 4 Collier on Bankruptcy ¶ 503.06[3]. When the estate continues to

operate the business, it assumes all the duties that flow from such operation. *See* 4 Collier on

Bankruptcy ¶ 503.06[3]. The estate must pay the victims of any breach of such duties as

administrate expenses. *See id.* To hold otherwise would allow the estate to take extremely risky

actions to benefit the creditors without having to worry about the consequences. *See Reading*,

391 U.S. at 482; 4 Collier on Bankruptcy ¶ 503.06[3]. The amount of benefit to the estate in

such a case is measured by the damages incurred by the wronged party. 4 Collier on Bankruptcy

¶ 503.06[3]. Thus, damages caused by post-petition torts incurred during the operation of the

estate's business are given administrative priority. *Id.*

Here, if the Debtors did trespass on property in the possession of Enterprise, the trespass

likely would be considered a transaction between Enterprise and the Debtor. In California a

trespass constitutes a new cause of action each moment it is continued until abated. 43 Cal. Jur.

3d Limitation of Actions § 92. The reason for this is because the act of interfering with the

exclusive possession of the land is continuous. *Id.* This is in contrast to other torts where the

tortious act normally begins and ends in a short period of time, *e.g.* assault, battery, or

negligence. With trespass, the act may go on for years. It may start pre-petition, but continue

post-petition. Any post-petition trespass is a transaction with the estate because it is the estate

that allows the interference to continue. Therefore, in the event that this were a trespass, it would

be a transaction with the estate from the petition date forward.

The second requirement, benefit to the estate, is where Enterprise's claim fails. Only torts that flow from the post-petition operation of the debtor's business are actual and necessary. *See In re Jartran*, 732 F.2d at 587 (stating that the debt must be "beneficial to the debtor-in-possession in the operation of the business"); 4 Collier on Bankruptcy ¶ 503.06[3]. The Debtor RadLAX Gateway Deck owns the Parking Property. Its only asset is the Parking Property and the parking structure on it. The Debtors began construction of the new parking structure with the sole intent of selling the Parking Property for a profit. They do not currently operate, and have never operated, any business on the Parking Property. Furthermore, this Debtor has not benefited from actions post-petition because this Debtor has not gained anything of value. Therefore, any trespass would not stem from an attempt to preserve a going concern or any other type of value for the estate.

Enterprise's assertion that RadLAX Gateway Hotel, another of the Debtors, used the Parking Property to park cars to benefit its estate does not link the alleged trespass to the ongoing operations of the hotel. Simply put, the alleged tort is that the partially completed parking structure is trespassing on property in Enterprise's possession. That tort is not abated or exacerbated by the hotel's use of the Parking Property to park cars. In fact, that tort would have continued even if all of the Debtors ceased operations completely on the petition date. Therefore, even if there were found to be a trespass, it would not be a necessary cost of preserving any of the estates, would not benefit any of the estates, and does not qualify as an administrative expense against any of the estates.

- 11 -

III.    **Conclusion**

Enterprise's Motion for Order Granting and Requiring Immediate Payment of

Administrative Expense Claim and Providing Other Relief is denied.  The easement documents

do not show a clear indication that Enterprise was given an exclusive easement.  Enterprise has

also failed to show that any alleged trespass flowed from the post-petition operation of the

Debtors' business.  A separate order will be entered consistent with this decision.

Dated: March 10, 2011

Hon. Bruce W. Black
U.S. Bankruptcy Judge